# The City of Philadelphia *versus* Collins.

1. It has always been the policy of the legislature to require conceded rights in navigable streams to be subordinate to the public rights.

2. The Schuylkill Navigation Company by its charter could lease, &c., water-power, "provided that it be so done that it shall not at any time impede or interrupt navigation." The use of the water for Philadelphia, under a contract with the company as a power to supply water to the citizens, could not be so exercised as to impede, &c., navigation.

3. Where a public nuisance results in a private injury, the injured party has an action against the wrongdoer.

4. During a severe drought, Philadelphia used the Schuylkill water as a power in supplying the city, to such extent as to prevent boats from passing through the company's navigation. *Held*, that the city was liable to the boatmen for their injury from the detention, notwithstanding she had permission from the company to draw off the water.

5. In such case they were joint wrongdoers.

6. Torts are joint and several; one may be answerable for the wrong done by both tort-feasors; it cannot be apportioned.

7. The use of the water for the citizens for domestic purposes could not be restrained by legislation or grant.

8. For such purposes the law of paramount necessity would have justified the taking.

9. The maxim, *Actus Dei nemini facit injuriam*, applied.

10. In an action against the city for detention of a boat by drawing down the water, the declarations, communications and doings of city officials with the navigation company as to the subject-matter of the suit, *held* to be evidence.

11. The councils passed an ordinance appropriating $25,000 for support of the boatmen during their detention: *Held* to be evidence for the plaintiff.

12. The water was drawn down principally by its use for driving water-wheels as a power to supply the city with water. *Held*, to be no answer that she had no other machinery at the time; also, that she should have been provided with such machinery.

13. The city and company having acted together in reducing the water, the acts and admissions of both were evidence for the plaintiff.

14. The mayor notified the company that he would resist by force closing the gates to the water-wheels. *Held*, that this might be given in evidence for the plaintiff.

March 7th 1871. Before THOMPSON, C. J., READ, AGNEW and SHARSWOOD, JJ. WILLIAMS, J., at Nisi Prius.

Error to the District Court of *Philadelphia:* No. 183, to July Term 1870.

This was an action on the case brought November 24th 1869, by Henry Collins against The City of Philadelphia, to recover damages sustained by him from the detention of his canal-boat in the Schuylkill navigation for want of water by reason of the drawing off the water of the river during the drought of the summer of 1869 to supply the Fairmount waterworks.

The case was tried June 2d 1870, before Thayer, J. The plaintiff, on the 31st of July 1869, started his boat, drawn by two mules, manned by a captain, steersman and a driver, from Port Carbon, with a load of coal bound for New York. The boat arrived at

Manayunk on the 10th of August, and was detained there by the lowness of the water in the navigation until the 7th of September.

The captain of the boat testified that when he arrived at Manayunk: "I saw a crowd of boats ahead of us, and it is our rule on the canal to stop when the boats are ahead; we dare not go ahead; that was the reason we stopped."

There was considerable amount of evidence given as to the state of water in the river, the canal and at the comb of the dam; it sometimes being even with the comb of the dam and sometimes below it; also as to the draught of the boat and the depth of the water necessary to float it, &c.

Frederick Graeff, the chief engineer of the city water department, testified that in August and September he caused the water in the pool to be drawn below the comb of the Fairmount dam; the officers of the Schuylkill Navigation Company requested him during that time to close the gates, which he did on several occasions, but on the 9th of August he "was compelled to decline; there were two or three days on which we could not avoid keeping the gates open; it was the stoppage of the wheels they asked for." Navigation was suspended from August 14th till September 7th. "We estimate that 13½ gallons were required to pump one gallon into the distributing reservoirs by the turbine wheels; by the breast wheels from 22 to 27 gallons; the turbines were used almost exclusively." He testified that on August 14th 1869 he wrote a letter to the navigation company, to which he received a reply; and on the 23d he made a report to councils; his letter and report contained a correct statement of the facts; the necessity of supplying the city with water was what kept them drawing the water; the plan adopted to supply the city was to put an additional strip on the dam; the navigation company then opened sluices in the dams above, and produced an artificial flood; they worked on till that was drawn down; this was done until the rain came, September 26th; the plan was arranged between witness and the navigation company; this was what was reported to the city councils.

The plaintiff offered the message of August 23d 1869, of the mayor of the city to the councils, with the correspondence annexed.

This was objected to by the defendant, admitted by the court and a bill of exceptions sealed.

The message, after referring to the condition of the city in reference to the scarcity of water, amongst other things, says:—

* * * "The recent drought has been of unusual length, and the result has been that our water department under the pressure of the public necessity, and to avoid the horrors of a water famine, assuming responsibility in a manner which I fully approve, has

[City of Philadelphia *v.* Collins.]

been compelled, first, to take water-power to which it would seem to have no right, to the great injury, as it is alleged, of the parties thus deprived of it; and finally, when that resource was exhausted, to solicit, receive and day after day be wholly dependent upon further supplies of water-power voluntarily furnished by those very parties.

"The particulars of these transactions will appear in the correspondence with the officers of the Schuylkill Navigation Company herewith submitted. * * *

"In regard to the claims of parties interested in the navigation of the Schuylkill, mentioned in the letter of the navigation company, dated 11th instant, but few remarks are necessary. If the facts be as there stated, compensation for any loss sustained by our compulsory stoppage of loaded boats, seems to be due as a simple measure of justice, outside of the question of legal liability.

"But as to the action of the navigation company in voluntarily coming to our rescue in the hour of our utmost need, when, in the words of our chief engineer, 'three days' supply of water may be vital to Philadelphia,' the occasion requires something more. If I understand their course aright, they did not in this instance pause to consider the legal aspects of the case, but in the face of a distinct assurance from our agent that he had no power legally to bind his principal, they at his earnest entreaty at once closed their locks, drew down their dams and trusted everything to our honor.

"Upon that faith in us they may sustain heavy losses of revenue, whilst we have received great benefit.

"I therefore cannot doubt that councils will without delay make such provision as will fully indemnify the company for whatever losses they may have sustained in thus furnishing the needful supply to the city in her extremity." * * *

The correspondence referred to in the foregoing message was,—

1. Letter, August 7th 1869, from the secretary of the Schuylkill Navigation to Frederick Graeff, chief engineer.

"The obstructions to the navigation of this company, caused by the action of your department, in drawing the water of Fairmount pool below the level of the top of Fairmount dam, have of late been so serious as to make it necessary on our part to use every effort to prevent their recurrence. With this view we propose soon to urge upon the proper authorities to provide a suitable steam-engine, to be used in supplying the reservoirs at Fairmount during the few weeks in the year when the water-power is insufficient for that purpose. We propose this course in the first instance, rather than a resort to legal proceedings, because we are aware that every effort on your part has been made to comply with the agreement between the city and this company,

[City of Philadelphia *v.* Collins.]

under which the former alone derives its right to use the water of Fairmount pool as a motive power, and that the repeated violations of that agreement, by drawing off the water below the level of the top dam, are frankly admitted and explained without being attempted to be legally justified upon the ground that they were necessary in order to supply the city with water. The object of this note is simply to place upon record the above facts, and to express the hope that you will at the earliest moment call the attention of the watering committee to them, and urge upon the committee the adoption of such measures as in your judgment are best adapted to the case."

2. A letter, August 11th, from the same to the mayor, written in pursuance of a resolution of the managers of the navigation company, and enclosing a copy of a note to Mr. Graeff.

\* \* \* " To-day, in consequence of the refusal of the city to comply with its agreement not to draw the water below the level of the top of the dam, the navigation for loaded boats in Fairmount pool has been entirely suspended.

" With the aid thus obtained by taking water belonging to the navigation, the city may, after incurring heavy liability to all injured by this illegal obstruction of the public highway, supply power to its machinery at the Fairmount waterworks for a short time longer; but should the drought continue there is little doubt that the entire water of the river will soon prove inadequate for that purpose. The result may be such a diminution of the supply of water to the city as will occasion great deprivation and suffering, and, in the event of fire, great disaster.

" Under these circumstances, the managers of this company have directed me to address you, partly for the purpose of calling attention to the responsibilities which the city may incur by its illegal acts, but chiefly with a view to put you in possession of the main facts of the case. \* \* \*

" I accordingly beg leave to submit a brief statement of certain points, &c., \* \* \* as there are misapprehensions concerning them.

" The most important of these misapprehensions is a belief that this company claims the right to limit the extent of the city's use of the water of the Schuylkill for distribution from its reservoirs.

" This company has never made such a claim. \* \* \*

" But the use of the water-power created by the dam at Fairmount, or by any other dam on the Schuylkill navigation, stands upon a different footing altogether.

" The only right which the city has to such use of the water in the Fairmount pool is derived by grant from this company under the agreements, and it is from such use of the water, as motive power, that the whole difficulty flows.

[City of Philadelphia *v.* Collins.]

" The grant from the company to the city was confined within the limits by which the company itself was restricted by its charter, by providing that every such grant be so framed 'that it shall not at any time impede or interrupt the navigation.' Accordingly the grant to the city is only of ' the water and water-power that shall remain after drawing off from the dam there erected, so much as may be necessary for the purpose of the navigation of the said river, canal and locks ;' and it provides also that the city 'shall only have such use of the said water as with the use thereof for the purposes of the navigation aforesaid will not reduce it below the surface or top of the said dam, or keep it so reduced.' " * * *

3. Letter, August 14th, F. Graeff to Charles W. Wharton, assistant president Schuylkill Navigation Co. ·

" As you are aware, the exigencies of this department have for some days past compelled it to draw the water from Fairmount dam below the point stipulated in the agreement between the city and your company.

" Although this has furnished much relief by enabling us not only to use the amount thus drawn, but also that which has been retained in the dam by the consequent stoppage of the passage of your loaded boats through the locks, yet at this time, owing to the continuance of the drought, and in part to an accident to one of the steam-engines at the Schuylkill works, the supply in our reservoirs is so low as greatly to imperil not only the comfort but the safety of the city.

" Under these circumstances, I feel it my duty to make an earnest appeal to your company, not only to close the locks at Fairmount entirely, but also to draw off their dams above Fairmount to the utmost extent possible, and to keep your works in that condition until the present crisis is over. The question of indemnity to your company for the loss it may thus sustain must of necessity be left open, it being out of my power to make any arrangements upon the subject, but I am persuaded that you may rely with confidence on the authorities of the city to do full justice on the occasion."

4. Letter, August 14th, Mr. Wharton to Mr. Graeff.

" In reply to yours of this date, just received, I have the honor to state that, placing full reliance upon the city for indemnity against all losses and liabilities which this company may incur in consequence of a compliance with your request, I have, without awaiting the action of the managers, assumed the responsibility of acceding to it. I have accordingly given orders by telegraph that the locks at Fairmount be herewith entirely closed, and the pools above drawn down to the greatest possible extent— the works to remain in this condition until the emergency to which you refer is over."

[City of Philadelphia *v.* Collins.]

There was also correspondence with other officers of the navigation company, by which it appeared that the directions of Mr. Wharton were carried out. Also other correspondence between the city authorities and the officers of the navigation company in reference to the use of the water, &c.

Objection was made by the defendant to the admission of these papers; they were admitted and several bills of exception sealed.

John Frick, an officer of the company, testified, that he had asked those having charge of the gates to close them until the water rose to the comb of the dam; the last time he asked was August 11th; the request was always refused.

He was asked how long the water continued below the comb of the dam. The question was objected to by the defendant, admitted and a bill of exceptions sealed. The witness, amongst other things, testified that except on August 16th, there was not water enough to allow boats to pass from August 14th to September 7th, before which time from August 11th the water had not been as high as the comb of the dam.

Plaintiff offered to prove that on August 11th 1869, a committee of the Schuylkill Navigation Company waited on the mayor as to the closing of the gates; that the mayor said he would prevent the exercise of their rights by the whole police force of the city, and that in consequence the navigation company submitted.

Objected to by defendants, admitted and a bill of exceptions sealed.

The witness then testified: "I was one of the commissioners of the navigation company. We went to the mayor August 11th 1869; a discussion ensued whether the company should attempt to close the gates of the forebay at Fairmount. The mayor said, If you do that I shall be obliged to undo it—for the question of the supply of water to the city at that time was of too momentous a character to allow the company to shut down the gates. In the course of conversation it was stated to the mayor that in a previous year a similar interview had been had with Mayor Henry, who had said he would resist the closing of the gates with the police force of the city. Mayor Fox said Mayor Henry was right, and he would do the same. The attention of the mayor was at that time particularly drawn to the fact that the men were being detained, and that it would be necessary to do something to supply them with provisions. He said the attempt would create a great deal of feeling, and that no right was to be waived by abstaining from what would be a mere form, and that he would take the earliest opportunity of calling the attention of councils to the fact. The mayor was informed of the fact that this suspended the navigation."

The plaintiff offered in evidence the following ordinance of the

city councils, which was objected to, admitted and a bill of exceptions sealed : " That the sum of twenty-five thousand dollars be and is hereby appropriated to the department for supplying the city with water, for the purpose of payment to the Schuylkill Navigation Company; Provided, That if the said Schuylkill Navigation shall hereafter establish any claim against the city, this amount shall be considered as an offset *pro tanto* to said claim." * * *

The foregoing, with the charge of Judge Thayer, and the opinion delivered by C. J. Thompson, will sufficiently elucidate the case.

The plaintiff submitted three points and the defendant six, all which are stated in connection with the judge's answers, except the defendant's 5th and 6th ; those are as follows :—

5. If the jury find that the period of the detention of the plaintiff's boat was one of extraordinary drought along the line of the Schuylkill river, and that the city of Philadelphia used no more water than was reasonably needed for the supply of its inhabitants, including the amount requisite for power, the verdict should be for defendants.

6. If the period of the detention of the plaintiff's boat was one of extraordinary drought, and the low stage of the water and the consequent detention of said boat was caused by such drought, and not by any unusual use of the water of the river by the city of Philadelphia to supply the actual necessities of the citizens, then the plaintiff is not entitled to recover.

As a number of assignments of error were made to the charge, it is necessary for an understanding of the case to give it somewhat at large.

Judge Thayer charged : * * *

["If the city occasioned the detention by using a larger quantity of water for propelling power than they were by law entitled to use, then they are responsible to the plaintiff for any damages which he may have suffered in consequence thereof. So that you will perceive that the case presents questions which are mixed questions of law and of fact."]

* * "In the first place, the Schuylkill river was originally a navigable stream, without any artificial obstructions, navigable at any rate as far as the Falls of the Schuylkill. It was a navigable stream for boats of some draught for that distance; above that for nothing of any considerable draught. By an act passed on the 9th of April 1807, Robert Kennedy, who owned a mill site on the north-east side of the Falls of the Schuylkill, was authorized to dig a mill-race there, to lead off so much of the water of the river as was necessary for a grist and a saw-mill, or such other machinery as he might find it convenient to establish there.

" That right he received by a grant from the Commonwealth,

dated the 9th of April 1807. On the 31st of March 1810, Robert Kennedy granted all the water-right which he had acquired to Josiah White. By an Act of Assembly, dated the 8th of March 1815, the Schuylkill Navigation Company was incorporated for the purpose, as it is expressed in the act, of making 'a complete slack-water navigation, so as to admit of a safe and easy passage for loaded boats, arks, and other vessels, up and down,' and the necessary powers were conferred upon them to accomplish this.

"By the 15th section of this act of incorporation, the company was authorized to use the *water-power* from the said river, to propel such machinery as they might think proper to erect, and to sell in fee simple, lease or rent, the said water-power, to be used in such a manner, and on such terms, as they may think proper, '*provided it be so done that it shall not at any time impede or interrupt the navigation.*' They had the power to sell the water-power as well as to use it themselves, under the restraint always of this proviso which prevented their driving it to an extent which should result in impeding or interrupting the navigation.

"By articles of agreement, dated the 14th of August 1816, with Josiah White, the Schuylkill Navigation Company granted to said White and his heirs the right to erect a dam at the Falls of Schuylkill, and invested the said White with all the rights of water-power at the Falls which the company was entitled to grant under their act of incorporation; 'Provided, however, that it be so drawn off, used and employed, that it should not at any time impede or interrupt or injure the navigation of the said river or canal.'

"By a deed dated the 1st of January 1817, Josiah White granted to one Joseph Gillingham a portion of the water-power which he owned himself, and by a subsequent deed, signed by both Gillingham and White, the water-power, which they had acquired in the manner which I have mentioned, was conveyed to the city of Philadelphia.

"In 1819, on the 3d of June, the Schuylkill Navigation Company and the city of Philadelphia entered into a contract with each other which has an important bearing upon this case. The city had then become the owner of whatever rights of water-power had been acquired by White and Gillingham; and being the owners, and the navigation company agreeing as well as the representative of the city, that it was desirable to increase the supply of water raised from the river Schuylkill for the use of said city, entered into this agreement.

"The three principal things agreed to in this contract were, first, that the city should construct a dam across the Schuylkill river near to Fairmount. The second thing which they agreed

18 P. F. Smith—8

[City of Philadelphia *v.* Collins.]

to was, that the navigation company should at all times have the right to draw off from the said dam as much water as they may deem necessary for the purposes of the navigation, and that the said mayor, aldermen and citizens shall and may enjoy all the remainder of the water of the said river for the purposes herein mentioned : 'Provided, that they do not at any time reduce the same, or keep the same reduced below the level of the surface or top of the said dam; it being the design and meaning of the parties that the mayor, aldermen and citizens shall only have such use of the water as with the use thereof by the said president, managers and company will not reduce it below the said surface or top of the dam, or keep it so reduced; and said dam is to be kept up in good and sufficient repair by the city of Philadelphia.' * * * The state, in granting the water-power, with the right to alienate it, had the right to couple the grant with any conditions which she might think proper, and she did couple the grant with the condition that the water-power should not be used in such a manner as to obstruct or impede the navigation which was contemplated by the Act of Assembly. * * *

. "The city, under any circumstances, had no right by using the water-power at Fairmount for the propulsion of their wheels to reduce the water *below* the comb of the dam. Whether they had the right to reduce it *to the surface* of the dam is a question which depends upon a question of fact; and that is, whether by reducing it to the surface of the dam the navigation was impeded. [If it impeded the navigation, then the city had no right to reduce the volume of the water even to the surface of the dam; but so long as it did not impede the navigation, they might reduce it even with the surface of the dam, but no further.]

"You are to inquire, in the first place, whether the use which the city made of the water-power was the cause of the detention. That is a question of fact for you and for you alone." The judge recapitulated the evidence on this question.

* * * "[I feel it to be my duty to say to you that the existence of the extraordinary drought would in no respect alter the rights of the parties, neither does the argument of necessity relieve the city from responsibility if they are otherwise responsible.] A solemn contract and agreement is binding upon the parties at all seasons, in dry seasons and wet seasons alike, and under all circumstances, and a party cannot justify himself for violating the agreement by any severity or stress of weather, or surrounding circumstances. Now, if there was a necessity for the city to have water, as undoubtedly there was, for the use of the citizens, obviously they might have had it by using some other power than the water itself.

* * * "[If by using the water as a propelling power they were necessarily obliged to infringe upon that law of the Commonwealth

which declared that the water should not be so used as to impede the navigation, then it was plainly the duty of the city to provide some other means for raising the water than by using the water itself for power.]

"Now, the fact that sufficient prudence or foresight had not been shown on the part of the city officials, before the happening of this unusual drought, in order to provide the necessary means and implements for raising this water into the reservoirs without using the water itself, will not excuse the city from the consequences of their violation of the law, or from their responsibility to the plaintiff in this case, if you find that they have violated the law, and that the detention was owing to their violation of the law.

["The city had no right, under any circumstances, to draw off from the Schuylkill river a quantity of water which would reduce the volume of it to such an extent as to impede or diminish the navigation. They had no right to do that; and if the plaintiff's detention was owing to their doing that, and if his own negligence did not contribute to his loss, then your verdict must be for the plaintiff.]

"Now, as regards the question of the use of the water, it seems to me, gentlemen, to be in this cause a question not so much of the use of the water for drinking purposes, or for the ordinary purposes of domestic use, as a question of the use of the water for *power*. You will say how far the use of the water for consumption by the citizens constitutes an element in the just decision of this cause. Every individual residing upon the banks of a stream has a right to the use of the water to drink, and for the ordinary uses of domestic life; and where large bodies of people live upon the banks of a stream, as they do in large cities, the collective body of the citizens has the same right—the same, but, of course, in a greatly exaggerated degree. The city of Philadelphia would, therefore, have a perfect right to take as much water out of the Schuylkill river as was necessary for the use of every citizen in Philadelphia for drinking and for the ordinary purposes of domestic use; but the city of Philadelphia has no right to draw off the water to use it *as a propelling power*, if by doing so they diminish the capacity of the navigation of the stream. If, therefore, the plaintiff's detention was not caused by the consumption, but was caused by the use of the water as a propelling power, why then the city would be responsible.

* * * "I say further to you, that if they took so much as to reduce the water below the surface of the dam, then, if that was the cause of the plaintiff's detention, they are liable to the plaintiff. If the taking of the water down to the surface of the dam, and no lower, would *not* impede the navigation which was established by the various Acts of Assembly which regulated this naviga-

[City of Philadelphia *v.* Collins.]

tion, then the city had the right to the use of the water to the surface of the dam, the right to draw it off until it came down to the surface of the dam; but [if drawing it down to the surface of the dam impeded the navigation, and if that was the cause of the plaintiff's detention, then the plaintiff is entitled to recover.]

* * * "The plaintiff has requested me to charge you, 'First, If the defendants drew water from the pool of the navigation for use as water-power, and thereby impeded the navigation, they are liable to the plaintiff for all the direct and necessary damages or loss that he suffered by reason of such impediment or hindrance to his lawful use of the navigation.' I affirm that point: if the drawing off of the water not only impeded the navigation but produced the plaintiff's detention, then the city is responsible; always provided the detention was not caused in any respect by the negligence of the plaintiff himself.

"Secondly, I am asked to say, 'If it is pretended that the city was authorized to do this by the license of the navigation company, then the court is asked to instruct the jury that the navigation company could not authorize any act which injured or stopped navigation, and the defendants cannot avail themselves of any such license.' I affirm that point: neither the city nor the navigation company had any right to destroy the navigation while the plaintiff was passing through its accustomed channels, and if the navigation company assented to that —assented to its being done by the city—it is no justification of the act, and it does not relieve the defendants from responsibility.

"Thirdly, I am asked to instruct you that 'the city in regard to this act is in the same position as any individual who does any act whereby passage on a highway is suspended or injured, who is always liable to any one injured by being thus deprived of the use of the highway.' I have already said that the rights of the parties are to have the same consideration at your hands precisely as if the controversy were between individuals, instead of being as it is between an individual and the municipal corporation.

"The defendant has requested me to instruct you upon several points :—

"'First, that if the jury find from the evidence that plaintiff's boat was not detained in Fairmount pool, but in an upper pool, the depth of which could not be diminished by any drawing of water from Fairmount pool, then the verdict should be for defendants.' I cannot so instruct you. It must be obvious that if the lower or Fairmount pool, which had to be crossed in order to procure an exit from the river, was so low that the plaintiff could not go down into it, the fact that he was kept in the pool above being the necessary result of the cause of the lowness of the water in the lower pool, would make the defendants just as responsible (if they are responsible at all upon the principles which I have men-

tioned) as if he had been caught below. I cannot see any difference.

"Second. 'If the jury find from the evidence that the stoppage of the plaintiff's boat was occasioned directly by the act of the Schuylkill Navigation Company, then their verdict should be for the defendants.' If the stoppage of the plaintiff's boat was occasioned by the act of the Schuylkill Navigation Company, and not by the act of the city, the defendants are not responsible.

"If the navigation company closed the locks when there was water enough in the pool for the plaintiff's boat to pass, and if such closing was the cause of detention, and not the low stage of the water in the pool, then the defendants are not responsible to the plaintiff for the detention.

"I feel bound, however, in fairness to say, gentlemen, in connection with that, that it appears to me that one of two things must be admitted, viz., either that the navigation company closed these gates because the water was too low to allow of the passage of boats, or else they closed them in order to facilitate the operations of the city in filling their reservoirs.

"Now, in either case, the city would not be relieved from responsibility. If they closed the gates because there was not sufficient water, why then if the lack of water was unlawfully produced by the defendant, the defendant is responsible. If they closed the gates in order to enable the chief engineer of the Fairmount waterworks to avail himself of the water for the purpose of filling the reservoirs for the purpose of driving his wheels at Fairmount in order to pump the water into the reservoirs, and in that way to protect the city of Philadelphia and its people from disaster and suffering, then, although that would be an act of co-operation on the part of the company with the city in the detention of the plaintiff, yet the fact of such co-operation would not relieve the city from liability if the cause of the plaintiff's detention was the taking of the water unlawfully by the defendant—the city. It is no defence to an action for damages for a wrong, that other people contributed to the wrong, and aided in the perpetration of it. That is never either a defence or excuse at law for the commission of a wrong.

"The third point: 'If the jury find from the evidence that the plaintiff contributed by act or neglect to the injury of which he complains, the verdict should be for the defendant.' I affirm that point without qualification.

"If the plaintiff's detention was owing to his own fault in any degree, he cannot recover from the city. He was bound to use due diligence to get through, and if he did not use ordinary and due diligence—the diligence which a man under such circumstances ought to use, and which all prudent men would use—and if this detention was owing in part to that, he cannot recover, because it is a settled rule of law that where an injury results

[City of Philadelphia *v.* Collins.]

from the negligence of both parties, the person who claims to recover damages, as well as the person whose immediate act caused the damages, the plaintiff cannot recover. If the plaintiff contributed to the loss himself by his own neglect, he cannot recover.

" Fourth. I am requested to charge you that, ' although the city had no right to reduce the water below the comb of the dam, yet, if the jury find from the evidence that plaintiff's boat could not have navigated Fairmount pool without a breast of water flowing over the dam, then the act of the city did not damage the plaintiff, and the verdict should be for the defendant.'

" In answer to that I say that I must decline to instruct you as requested in this point. For I say to you, whether the city was justified in drawing off the water to the extent of reducing it to the level of the surface of the dam depends upon this, viz., whether such a use of it impeded or interrupted the navigation.

" By the 15th section of the charter the company could not sell or grant any water-power which would have the effect of impeding or interrupting navigation.

" I leave it as a question of fact for you to determine whether reducing the water to the level of the surface of the dam impeded or obstructed the navigation.

" On the 5th and 6th points I must decline to instruct you as requested by the defendant. They relate to that part of the defence which is founded upon an alleged extraordinary character of the season. I consider that any unexpected event of that kind cannot either increase or diminish the rights which are secured by law. The law is made for all seasons, and it is to be supreme in all seasons, and the right which the city had not in a wet season she cannot have in a dry season." * * *

The verdict was for the plaintiff for $275.

The defendant removed the record to the Supreme Court.

The errors assigned were :—

1–6. The admission of the several offers of evidence by the plaintiff, as mentioned in the bill of exception.

7–12. The portions of the charge in brackets.

13–19. The answers to the points.

*G. W. Biddle* and *F. C. Brewster*, Attorney-General (with whom were *J. Lynd*, *W. B. Mann* and *T. J. Worrell*, City Solicitor), for plaintiff in error.—The determination of this cause rests upon four questions :—

1. What is the limit of the right of the city of Philadelphia to the use of the waters of the Schuylkill ?

2. Did the city transgress its right during the summer season of 1869 ?

3. If the city did thus exceed its right, did the defendant in error suffer damage from such transgression, or from his own act or that of a third party ? and

[City of Philadelphia v. Collins.]

4. If the act of the city was the cause of the injury, was this. the *proximate*, or the *remote* cause ?

1. The city, then, at the time at which this action is alleged to have accrued, had the right acquired under the original grant to Kennedy to the use of all the water-power at the Schuylkill Falls *at discretion*, and this was a *private* grant. The building of the dam at Fairmount did not destroy this water-power, but simply accumulated it at a lower point. Nor did the agreement of 1819 with the navigation company extinguish Kennedy's grant. It simply united the enjoyment of the water-power created by the descent in the river between the Falls and Fairmount, subject to the proviso of the company's act of incorporation, with that already possessed by the city at the Falls.

An agreement is to be construed on the basis of the circumstances about which the parties may be supposed to have contracted : Snyder v. Leibengood, 4 Barr 305 ; Schuylkill Nav. Co. v. Moore, 2 Wh. 477 ; Sergeant v. Ingersoll, 7 Barr 347. Above the right of the city to the use of the water-power of the Schuylkill acquired by legislative grant or agreement lies her inherent, original and natural right to the use of the water for the supply of the necessities of her citizens.

2, 3 and 4. The duty owing by the city was to the navigation company only. The company is responsible to the plaintiff for the injury, whether caused by the city or not : Mayor of New York v. Bailey, 2 Denio 433 ; Mayor of Albany v. Cunliffe, 2 Comstock 174 ; Tollit v. Sherstone, 5 Mees. & W. 283 ; Priestly v. Fowler, 3 Id. 1.

Drawing water from the Fairmount dam was a cause too remote. The river itself was so depleted by the drought, that it could not afford the company the means for its navigation : Morrison v. Davis, 8 Harris 171 ; Thomas v. Winchester, 2 Selden 408 ; Ryan v. The N. Y. Central Railroad Co., 8 Tiffany 210 ; The Penna. Railroad Co. v. Kerr, 12 P. F. Smith 353. The invincible public necessity for the pumping and use of the water from the Fairmount pool justified the city : Russell v. The Mayor of New York, 2 Denio 461 ; Respublica v. Sparhawk, 1 Dall. 357.

*M. P. Henry* and *R. C. McMurtrie*, for defendant in error.— Where particular facts are inquired into and recorded for the benefit of the public, those who are empowered to act in making such investigations and memorials are, in fact, the agents of all the individuals who compose the public, and every member of the community may be supposed to be privy to the investigation : 1 Greenlf. Ev. 483 ; Starkie Ev., by Sharswood, 273. The admission of irrelevant evidence is not the ground for reversal where it could not have affected the trial of the cause on its merits : Lacy v. Arnett, 9 Casey 169 ; Lobb v. Lobb, 2 Id. 327. The

[City of Philadelphia *v.* Collins.]

subject of the grant from the navigation company to the city was fully considered in The Mayor *v.* The Commissioners of Spring Garden, 7 Barr 348, and the distinction recognised between the riparian right to the use of the water for domestic purposes, and the right to its use as a water-power. The right of navigation is superior to every other riparian right except that of using the water for domestic purposes: Shrunk *v.* The Navigation Co., 14 S. & R. 71; Carson *v.* Blazer, 2 Binn. 475; Act of March 23d 1803, 4 Sm. Laws 20; Murray *v.* Commonwealth, 12 Harris 270; Erie Canal Co. *v.* Walker, 5 Casey 170; Jessup *v.* Loucks, 5 P. F. Smith 350; Rundle *v.* The Delaware and Raritan Canal Co., 14 How. 90; The Barclay Railroad Co. *v.* Ingham, 12 Casey 194; Susquehanna Canal Co. *v.* Wright, 9 W. & S. 9. For an obstruction in the Schuylkill a private action can be maintained on proving peculiar damages: 2 Hilliard on Torts 72; Coole *v.* Sproul, 35 Maine 161; Rose *v.* Miles, 4 M. & S. 101; Greasly *v.* Codling, 2 Bingham 263; Rex *v.* Trafford, 1 Barn. & Adol. 874; Iveson *v.* Moore, 1 Ld. Raymond 486; Wilkes *v.* Hungerford Market Co., 2 Bingh. N. C. 281; State of Pennsylvania *v.* The Wheeling, &c., Bridge Co., 13 How. 518; Dugan *v.* Bridge Co., 3 Casey 303. The city cannot "define" the limits of the rights on this river, as used for the twenty-three preceding years, by suddenly drawing off the water to the extent to which they claim the right to do so, against the consent of the conservators of the navigation: Erie Canal *v.* Walker, 5 Casey 170; The Attorney-General *v.* The Cohoes Co., 6 Paige 133. The company had the right to maintain the navigation by the use of strips on their dam instead of deepening the channel: McKeen *v.* The Del. Div. Canal Co., 13 Wright 438.

Defendant in error cited the following authorities in support of the plaintiff's right of action against the city: Hughes *v.* Heiser, 1 Binn. 463; Cumberland Valley Railroad *v.* Hughes, 1 Jones 141; New Jersey Steam Nav. Co. *v.* The Merchants' Bank, 6 How. 344; Payne *v.* Rogers, 2 H. Bl. 350.

The opinion of the court was delivered, May 8th 1871, by

THOMPSON, C. J.—We have given this case, and the manner of its trial, much consideration; and, although the remark seems like anticipating a result, we regard the case as having been carefully, considerately and well tried by the learned judge below. It was the case of a canal boatman, with a boat-load of coal, passing over the Schuylkill Navigation Company's works from Port Carbon, Schuylkill county, and destined for New York, but prevented from passing out of their works after arriving at Manayunk, on the 10th of August 1869, by reason of the insufficiency of water at Fairmount dam to pass the boats ahead of him over the pool and out of the outlet locks. He was detained in the

[City of Philadelphia *v.* Collins.]

canal at Manayunk and in the pool from the 10th day of August until the 7th of September ensuing, with his boat, hands and team, a period of twenty-eight days, for which detention he sued the city, and recovered in this case the sum of $275 damages. The great question of the case was and is, how did the city become liable for these damages to the plaintiff, resulting from a scarcity of water in the navigation company's works? To answer this, takes us back a step to ascertain the relations of the navigation company and the city to each other, and to the public.

The company was incorporated by Act of Assembly of 8th March 1815, with power to construct a slack-water navigation in the river Schuylkill, from a point in Schuylkill county to Philadelphia, including Fairmount dam. This, of course, was to be accomplished by the erection of dams and locks: and the water-power created by the dams to be erected, was to belong to the company, to use, lease or sell: "*Provided, that it be so done that it shall not at any time impede or interrupt the navigation.*" The stream had long previously been declared a public highway; and, as it was the policy of the legislature—as it has ever been—to require all conceded individual rights in navigable streams to be subordinate to the public rights in such streams, this proviso was inserted. Decisions under the Act of 1803, called "The Mill-dam Act," are illustrative of this policy: Susq. Canal Co. *v.* Wright, 9 W. & S. 9; New York and Erie Railroad Co. *v.* Young, 9 Casey 175.

Under this limitation in the charter, it is apparent the company could make no grant of *water-power*, to any person or corporation, which would impede or interrupt the navigation of the works to be constructed by them. This was a fundamental condition of the grant by the state, and an implied prohibition of any such thing. In June 1819, the Schuylkill Navigation Company and the city of Philadelphia entered into a contract by which the former acquired a right to increase the supply of water for the use of the city from the Schuylkill river. The city engaged to erect a dam across the river near Fairmount, and to have all the water at said dam which the company should not need for navigation purposes, the company reserving, pursuant to the limitation in its charter, just noticed, the water required for navigation, and the right to draw from the dam as much as it might deem necessary for passing boats and other craft into and out of the pool of the dam through the locks. Then follows a proviso in the grant to the mayor, aldermen and citizens,—"That they shall not at any time reduce the same, or keep the same reduced, below the level of the surface or top of said dam,—it being the design and meaning of the parties, that the mayor, aldermen and citizens shall only have such use of the water as, with the use thereof by the

[City of Philadelphia *v.* Collins.]

said president and managers and company, will not reduce it below the said surface or top of the dam, or keep it so reduced."

It was the theory of the plaintiff's case, that the city did, in violation of the prohibition in the charter of the navigation company, and of the terms of its own contract, draw from the dam at Fairmount water that was needed for navigation, at the time he was stopped; reducing it below the top of the dam, and thus impeding and obstructing him in the navigation of that highway, and that this occasioned the special damages claimed by him in this suit.

The question whether the facts proved were as assumed, was a question for the jury, and was in various modes explicitly submitted to them by the learned judge below. The law of the case, so far as it holds that where a public nuisance results in a private injury it is the subject of an action by the injured party against the wrongdoer, is undoubted, and was properly so administered on the trial. The following references clearly established this : Mechling *v.* Kittanning Bridge Co., 1 Grant 416 ; Buck Mountain Coal Co. *v.* Lehigh Coal and Nav. Co., 14 Wright 91; Hilliard on Torts, Vol. 2, p. 72; Rose *v.* Miles, 4 M. & S. 101; Greasly *v.* Codling, 2 Bing. 263 ; Rex *v.* Trafford, 1 B. & Ad. 874; State of Pennsylvania *v.* Wheeling Bridge Co., 13 Howard 518.

Innumerable authorities might be cited to the same effect. The jury found the fact against the defendant, namely, that the city had drawn water from the dam to an extent beyond its contract allowance and obligation, and that this was prejudicial to the navigation, and impeded the plaintiff lawfully navigating it.

Was it proper to submit these questions to the jury ? Beyond a doubt, it was; otherwise the plaintiff's right to show his injury, and that it was by the act of the city, would be defeated. If the city could be made liable at all for the injury, the plaintiff had a right to show wherein she was wrong. It was very clearly proved that for the purposes of water-power she used about *thirteen and a half times more water than for the use of her reservoir*, and that the water thus consumed was eight and a half times—and probably eleven times—as much as would have sufficed to pass forty boats a day through Fairmount locks. This was not contradicted, as the city gave no evidence whatever; and this, with other testimony supporting it, was undoubtedly believed by the jury. No water necessary for navigation was allowed by law to be drawn by the company, or authorized by it to be drawn. As the city did draw, how is she to escape liability, if injury resulted on account thereof to a passer on the highway? She violated the law of the highway by doing so, and we cannot see how she can escape the consequences. It was claimed that it was on the company the liability to the plaintiff ought to rest. But the answer to that argument was truly as stated by the learned judge. It is

[City of Philadelphia *v.* Collins.]

not for the city to say that she had a co-wrongdoer. Torts are not necessarily joint; they are joint and several. One may be answerable for all the wrong done by himself and his co-tortfeasor. The injury cannot be apportioned. The city could not plead ignorance of the provision in the company's charter, that water for water-power did not exist when it was wanted for navigation; or her own contract to the same effect, inserted for the purpose of protecting navigation. If she took it when it was so wanted, she violated a regulation of public law, enacted for the benefit of the public, and is amenable, notwithstanding another may have co-operated in doing the act and might also be made answerable.

It was conceded on the trial, that upon taking water for the citizens of the city for domestic purposes, no restriction could be placed by legislation or grant, and none was placed. If it could have been shown that it was this supply for domestic purposes only, which occasioned the insufficiency for navigation, then the law of a paramount necessity would have existed, and have brought into play the doctrine of riparian rights, and justified the taking. But this did not appear, and was not the fact. Nor was it denied that if the drouth had been so severe as to have been incapable of mitigation by the use of any means to keep the navigation open, the defendant would not have been liable. The case would then have been within the maxim *Actus Dei nemini facit injuriam.* But this was found against the defendant, and left her without justification and consequent defence. The law as to this was properly administered.

I scarcely feel that I need notice especially the answer of the court to the defendant's 4th point, now insisted on as error. The point was to the effect, that if the jury believed that the defendant did draw the water below the comb of the dam at Fairmount, and yet find that the plaintiff's boat could not have navigated the pool, the act of the city did not damage the plaintiff, and he cannot recover. The answer to the point was simply this, that an affirmation of the point in its terms must be declined; but that whether the law was as stated, would depend on whether the use by the city impeded or interrupted the navigation. That covered the ground of the question. If there was testimony to raise a point of this kind, it was testimony of which the jury could make the application, and it was properly for them to do so, and also to say under the charge, whether in such a category—viz., the inability to navigate the pool—the party was injured or not. If not injured, it would follow he could not recover. And then, again, it would depend upon the time, whether the point ought to have been answered as put. If after the city had virtually taken charge of the locks, and asserted by its officers a determination to control the water at Fairmount, it would have been an idle thing to have navigated the pool if he could not get out of the

[City of Philadelphia *v.* Collins.]

locks.   We think the point was sufficiently answered for the justice of the case and demands of the law.

We shall now notice the assignments of error on the bills of exception by the city to the admissibility of certain items of evidence offered by the plaintiff, and received by the court.   They consist of communications, declarations and doings of the city officials, such as mayor, city councils, and chief engineer of the waterworks, in regard to the subject-matter involved in the suit, in connection with the officers of the Schuylkill Navigation Company on the same subject.

It is difficult to find a good reason for rejecting the acts and declarations of a party to a cause, or a duly constituted agent, in the transactions out of which it grows, if relevant for any purpose.   The communication of the mayor to the councils of 23d August 1869, was important as part of the *res gestæ*, in the transaction of the mayor, in virtually taking the control of the dam and water for the city.   He was the executive officer of the city, its official head; and when he spoke in regard to the condition, wants and responsibilities of the city respecting a competent supply of water, it certainly was evidence against the city, and especially as it was acquiesced in by her.   That it was not so acquiesced in, was not shown by the defendant.   And when the councils acted, in view of the admitted loss to the company, or loss to boatmen, by appropriating $25,000 to it, for and on account, it must be supposed, of the infringement of its rights and losses consequent thereon, it was evidence of an admission by the legislative branch of the city government of liability, to some extent at least, on account of the matter which brought the injury to the plaintiff.   It does not stand on the footing of a compromise.   There was no error, we think, in this.

So the correspondence and declarations of Mr. Graeff, chief engineer of the waterworks, must be regarded as made by the city.   They directly related to the very matter of the taking the water beyond what was granted to the city, or allowed to be granted by the company.   They served to show the foundation of the action of the city in taking the water, and the supposed necessity for the action by the city officers.   The city can only speak by the mouths of its agents, and Mr. Graeff was one of them—and an important one—in the matter of water.   It was not possible to exclude her acts and declarations.   That they were not made to the plaintiff, was of no consequence.   If made to those whose acts injured the plaintiff, and were acted on by them, they were their own acts by adoption.   They were never repudiated by the city,—at least there is no evidence that they were ever disavowed.

It was a matter proved, and not contradicted, that if the water used for propelling her water-wheels by the city, and permitted to escape through them below the dam, had not been so used,

there would have been water enough for the reservoir and navigation both. It was no answer to the plaintiff's claim, that the city had no other machinery but water-wheels by which to force the water into the reservoir. The answer to that is, that she ought to have had machinery which would have saved this water, seeing that she must have known that water for propulsion was prohibited whenever navigation might be affected by its use for such a purpose. No one can allege a neglect as an excuse for an injury, any more than can a man his own turpitude for a failure to perform a duty. This view was presented to the jury in the charge of the learned judge, and necessarily became the subject of consideration by the jury in ascertaining the rights of the plaintiff, and of the city to respond in damages.

Of necessity, the letters of the company, in answer to the water department, were admissible. Undoubtedly they might be given in evidence by the plaintiff, although the company was not sued. The result was brought about by the acts of the city and company together. Acting together, the acts and admissions of both were evidence for the injured party. The whole scope of the testimony shows that they acted together in relation to the detention of the water ; as between themselves it must be a question of whose was the fault. Not so as to the plaintiff. The whole series of acts and declarations culminating in the detention of the water at Fairmount, so as to prevent plaintiff from getting through with his boat, were *res gestæ*, and proper to be given in evidence.

On the same principle was the admission in evidence of the mayor's declaration,—that he would resist with the whole police force of the city any attempt by any party to close the head-gates of the waterworks. He was the chief executive officer of the city, and as such made the announcement. The company had a right to close the gates if the navigation required the water. The company was authorized to believe the threat sincere, and was not bound to test it, *vi aperta*, and take up the gage and try the arbitrament of force. He had a force, to which he referred, sufficient for the carrying into effect the intention avowed. It was, no doubt,—under the state of alarm in the city about a water famine, and the appearance of things,—seriously meant, and doubtless well intended. But, however, as we have already shown and will further show, there was no actual necessity for the detention of the water. Thirteen and a half gallons were required to save one for the city. This went for propelling power. Mr. Trautwine, a civil engineer, estimated, and so testified, that the average consumption for "water-power" alone at the wheels of the works, was, at the lowest calculation, eight and a half—and perhaps eleven—times sufficient for the passage of forty boats daily at Fairmount. Water-power was forbidden when navigation required it. But, more than this, we regard it as demonstrable,

[City of Philadelphia *v.* Collins.]

by the uncontroverted fact, that a resumption of navigation took place in the Schuylkill on the 7th of September 1869, without any accession to the volume of water in the river from rains, between the date of closing navigation, and that date, a period of twenty-eight days. It must, therefore, have been the act of the city and the company, or one of them, that produced the result, and not an act of Providence as contended for. The jury having found, upon competent evidence, that the plaintiff was injured by being delayed for want of water in navigating his boat, and that the city was at least a party to this result, and was in law without justifying causes to sustain her, a recovery against her seems to have been a necessary consequence of her position and acts under the proof.

We have thus noticed, in a general way, we think, every controverted position in the charge and ruling of the learned· judge as to evidence, and, finding no error in either, the judgment must be affirmed. We regard it as a hard case, but we cannot alter the law to relieve the hardship ; nor have we any control over the facts when properly admitted in evidence ; they were for the jury.

Judgment affirmed.

READ and SHARSWOOD, JJ., dissented.