## Filbert *v.* Dechert, Appellant.

*Waters—Rights of riparian owners—Use of water for ordinary purposes —Insane asylum—Domestic use.*

All those who lawfully occupy riparian lands have a right to the ordinary use of the water of the stream for the purpose of supplying their natural wants, including drinking, washing, cooking and about their habitations for such things as are necessary to the preservation of life and health. This natural right is not dependent upon whether the dwellers by the stream occupy homes or hospitals, are sheltered by tents, or live in the open.

A state hospital for the insane having inmates to the number of 900 situated on the banks of a stream may take from the stream all the water necessary for the natural wants of the inmates, although the taking of the water results in a loss to a lower riparian owner. The loss of the latter is damnum absque injuria, but the asylum cannot take water to operate a fountain, nor for the manufacture of ice to be sold away from the premises.

*Waters—Witness—Cross-examination.*

In an action by a lower riparian owner against an upper riparian owner to recover damages for an alleged wrongful diversion of water, where a witness for the plaintiff testifies that the supply of water at the plaintiff's mill was diminished about the time of the erection and occupancy of the defendant's buildings, and that the rental value of the mill was thereby decreased, it is competent for the defendant to ask him on cross-examination any question which tends to throw light upon the knowledge which the witness had of the facts, or show the condition which had resulted in the diminution of the supply of water, and whether the defendant was responsible for those conditions.

Argued Nov. 11, 1902. Appeal, No. 24, Oct. T., 1902, by the State Asylum for the Chronic Insane of Pennsylvania, from judgment of C. P. Berks Co., March T., 1900, No. 32, on verdict for plaintiff, in case of Kate S. Filbert v. Henry M. Dechert, Trustees, and the State Asylum for the Chronic Insane

of Pennsylvania.   Before BEAVER, ORLADY, W. W. PORTER and W. D. PORTER, JJ.   Reversed.

Trespass by lower riparian owner against upper riparian owners to recover damages for alleged unlawful diversion of water.   Before ERMENTROUT, P. J.

At the trial it appeared that the plaintiff owned a gristmill and sawmill and that the water power for these mills was seriously diminished by the diversion of water for the use of the inmates of the State Asylum for the Chronic Insane of Pennsylvania, which was situated on the same stream as the mills but above them.

H. H. Miller, a witness for plaintiff was asked this question, on cross-examination :

Mr. Ruhl: " Q. How did all the changed conditions that you found there after 1893, I mean the changed conditions with reference to the quantity of water that the mill had, the supply of water which the mill had, how did it affect the rental value of the plaintiff's property?   Did it increase or diminish it?"

Mr. Snyder: Defendant makes the same objection (to wit: it does not appear from the testimony of this witness or any one else that the diminution of the water was owing altogether to anything that was done by the asylum.   Witness himself says that they had plenty of water during a rainy season and had less during a dry season.   He could not fix any time when the rainy season prevailed or when the dry season prevailed. He does not state how much of the time they could work the mill a shorter period, and therefore he does not give the elements upon which to base his opinion as to loss of rental value so as to affect the defendant).

The Court: The objection is overruled.   Exception for the defendant.  [5]

Mr. Snyder: " Q. Do you know that from 1892 on up to 1896, the Robesonia Iron Company was continually taking more and more water out of Furnace creek ? "

Mr. Ruhl : Objected to, first because it is not cross-examination, second, because it is immaterial and irrelevant.   Third, it is introducing the defendant's case on cross-examination of plaintiff's witness.

The Court : I think it would be practically introducing your

case on cross-examination. I will sustain the exception. Exception for the defendant. [6]

The court charged in part as follows:

[But as a matter of law applicable to the facts of this case, I feel it my duty to say to you that the defendant in this case is not taking the water for domestic purposes. This is a legal question which it is incumbent upon the court to answer, and it is a question that is fraught with great difficulties and requires very careful consideration, but for present purposes I feel it my duty to say to you—and you are bound to take the law as the court give it to you in considering this case—that the use made by the asylum of this water is not for domestic purposes. Therefore, if the amount of water taken from the channel of this stream sensibly or materially diminished the flow, then the defendant has subjected itself to an action for an excessive use or diversion of the water. No matter what the necessities of the asylum may have been, no matter how useful the institution may be, how praiseworthy it may be, it had no right to convey the water out of its course to the prejudice of plaintiff's rights.] [1]

[I have said to you already that this is not a proper use of a stream by a riparian owner. Therefore, the principle that I have just read applies to this case. If the jury find that there was any sensible or essential interference with this stream, the purpose for which these people have used it being wrongful, whether attended with actual damage or not, would entitle the plaintiff to a nominal verdict, as we call it, six cents damages and costs. If, however, there was more than a sensible or essential interference therewith, if there was an actual damage done to the plaintiff's rights by this interference, then the jury will pass to the question of the allowance of damages in excess of what the law terms nominal damages; and in considering that question you will take into consideration the testimony given on both sides of the case.] [2]

Verdict and judgment for plaintiff for $725. Defendant appealed.

*Errors assigned* were (1, 2) above instructions, quoting them; (5, 6) rulings on evidence, quoting the bill of exceptions.

*Jeff Snyder*, of *Snyder & Zieber*, for appellant.—There is no doubt that in Pennsylvania a riparian owner may use a stream of water flowing through his land, even if he consumes the whole of it, for the ordinary domestic purposes of life, without responsibility to a lower owner: Haupt's App., 125 Pa. 211; Lord v. Meadville Water Co., 135 Pa. 122; P. & R. R. R. Co. v. Pottsville Water Co., 182 Pa. 418; Penna. R. R. Co. v. Miller, 112 Pa. 34.

*C. H. Ruhl*, with him *Jeremiah K. Grant*, for appellee.—A proprietor of land over which a stream of water runs has, as against a lower proprietor, the use of only so much of the stream as will not materially diminish its quantity or corrupt its quality. His right is not to be measured by the reasonable demands of his business: Wheatley v. Chrisman, 24 Pa. 298; Penna. R. R. Co. v. Miller, 112 Pa. 34.

OPINION BY W. D. PORTER, J., March 12, 1903:

The plaintiff is the owner in fee of a tract of land through which flows Furnace creek, an unnavigable stream, upon which is erected a gristmill and sawmill operated by the water power. The corporation defendant is an agent of the state to which has been committed the possession and management of the property used as an asylum for the chronic insane, the title to the property being in the commonwealth: Act of June 22, 1891, P. L. 379. The land of which the defendant, as the representative of the commonwealth, is in lawful possession consists of a tract containing 540 acres, through which for a distance of about a mile flows Asylum creek, a stream which falls into Furnace creek, at a point above the land of the plaintiff. The state has erected upon its land extensive buildings, suitable as a place of residence for the insane, and has for a number of years there maintained the unfortunate of this class to the number of 800, the nurses and officers necessarily employed about the buildings increasing the total population living upon the land to about 900. Asylum creek enters the property of the defendant at a point nearly 100 feet higher than the asylum buildings, and the water used about the buildings has been conveyed from the creek through a six inch pipe. The plaintiff brought this action alleging a deprivation of her right to the

use of the water of said stream. The only injury to the property of the plaintiff suggested by the evidence was the diminution of the water power.

The riparian rights of the commonwealth are the same which would have been incidental to ownership by a private individual: Union Mill, etc., Co. v. Ferris, 2 Sawyer, 176. The defendant as the agent of the commonwealth in possession and control of the property possessed the same rights. The right of an upper riparian owner to divert the water of a stream for manufacturing or other purposes having no necessary relation to the use of his land, is limited as between himself and a lower proprietor to so much of the water as will not materially or sensibly diminish its quantity: Haupt's Appeal, 125 Pa. 211; Pennsylvania Railroad Company v. Miller, 112 Pa. 34; Clark v. Pennsylvania Railroad Company, 145 Pa. 438; Phila., etc., Railroad Company v. Pottsville Water Company, 182 Pa. 418; Miller v. Miller, 9 Pa. 74; Wheatley v. Chrisman, 24 Pa. 298. Title to land does not give an absolute right to the water which flows over it; the owner has a right to the reasonable use of the water in connection with his lands which are riparian, but he cannot convey it to a detached tract: Lord v. Meadville Water Company, 135 Pa. 122. "Every riparian owner has the right to use the water of the stream passing over his land for ordinary domestic purposes; and if the stream be so small that his cattle drink it all up, while it may be a loss to, the lower riparian owner, it is damnum absque injuria:" Pennsylvania Railroad Co. v. Miller, 112 Pa. 34; Mayor v. Commissioners, 7 Pa. 348; Philadelphia v. Gilmartin, 71 Pa. 140; Philadelphia v. Collins, 68 Pa. 106; Gallagher v. Philadelphia, 4 Pa. Superior Ct. 60; Slack v. Marsh, 11 Philadelphia, 543. The learned judge of the court below charged the jury that the use of the water made by the defendant was not a proper use of the stream by a riparian owner; and that "if the amount of water taken from the channel of this stream sensibly or materially diminished the flow, then the defendant has subjected itself to an action for an excessive use or diversion of the water." "No matter what the necessities of the asylum may have been, no matter how useful the institution may be, how praiseworthy it may be, it had no right to convey the water out of its course to the prejudice of the plaintiff's right." This language has the merit of

being free from ambiguity. The learned judge of the court below determined as matter of law that the defendant had no right to furnish to the inmates of the buildings upon the riparian land water for drinking, culinary and cleansing or any other purpose usually considered necessary to the preservation of life and health.

This conclusion seems to have been reached because of the frequent recurrence of the term " ordinary domestic purposes " in the authorities dealing with the rights of riparian owners. The learned judge, in his opinion refusing a new trial, says : " The principal question is whether the use of the water by the defendant is domestic in its nature." He then refers to the definitions of the word " domestic " found in several dictionaries, and thus states the result : " The central idea of both these definitions seems to be a family, home interest, something for the benefit of the family and home." Having thus reasoned out that there must be a home and a family upon the land before riparian rights become incidental to it, the learned judge proceeds to investigate the character of the residence of the insane patients upon the property of the state. Having satisfied himself that this public institution " is an asylum, not a home ; a house of detention ; a place of treatment for the chronic insane, a hospital," the process of excluding these dwellers upon the margin of the stream from all riparian rights is complete. Even if the spirit of a legal principle and the relations out of which it arises are to be disregarded, the meaning of the word " domestic " cannot be arbitrarily assumed to be always thus narrow. One of the declared purposes of ordaining the constitution of the United States was to " insure domestic tranquillity." As here used the term can hardly be said to imply an intention to preserve the peace of private families ; it refers rather to the regulation of internal public affairs, not foreign interests. The term ordinarily means pertaining to one's place of residence, or to the affairs which concern it, or used in the conduct of such affairs. The authorities do not leave us without a definition of the term. In Philadelphia v. Gilmartin, supra, Mr. Justice AGNEW said, in referring to the use of water for manufacturing purposes : " These uses are not domestic, that is, such as are for the preservation of the life and health of the population and their creatures."

Chief Justice PAXSON said, in Haupt's Appeal, supra: "If there was a tenant thereon he could use it for watering his stock and for household purposes, for any useful, necessary and proper purpose incident to the land itself and essential to its enjoyment." And again, in discussing the rights of the public in a private stream: "In such a case no one can use it or take the water except at a public crossing. There the traveler may stop, refresh himself and water his horse; the water has no owner and he impairs no man's right. But except at public crossings, such as a road or a street, no one but a riparian owner can use the water; not because the latter has any ownership in it, but because the stranger has no right of access to it. . . . It follows from what has been said that the dwellers in towns or villages watered by a stream may use the water as well as the riparian owner, provided they have access to the stream by means of a public highway." Mr. Justice THOMPSON, in Philadelphia v. Collins, supra, thus defines this right: "Every individual residing upon the banks of a stream has the right to the use of the water to drink and for the ordinary uses of domestic life; and where large bodies of people live upon the banks of a stream, as they do in large cities, the collective body of the citizens has the same right, but of course in a greatly exaggerated degree." The language of Chief Justice GIBSON, in Mayor v. Commissioners, supra, is to the same effect, and he speaks of the right as a "natural and inherent" one. The word as used in the authorities cited by the learned judge of the court below refers to the purposes for which the inhabitants may use the water, and not to the social status of the individuals occupying the buildings which may be upon the land. The right is a natural one, recognized as growing out of the natural wants of man ; it is inherent in the ownership of the land, and is to be enjoyed by all who lawfully dwell upon the premises to the ownership of which it is an incident, without regard to the duration or purpose of such residence. All those who lawfully occupy the riparian lands have a right to the ordinary use of the water for the purpose of supplying their natural wants, including drinking, washing, cooking, and about their habitations for such things as are necessary to the preservation of life and health. This natural right is not dependent upon whether the dwellers by the stream

occupy homes or hospitals, are sheltered by tents or live in the open. The state might lawfully ordain that the National Guard should encamp upon this tract of land and take water for their use, while there, from this stream. The ordinary use of the water, for the purpose of supplying the natural wants of those who inhabit the riparian lands, may involve an exhaustion of the stream without incurring liability to lower riparian proprietors: Attorney General v. Gt. Eastern Ry. Co., 23 L. T. N. S. 344. When the use is extraordinary, for the supply of artificial wants, such as manufactures, those whose supply of water is thereby sensibly diminished, have a right of action: Gould on Waters (3d ed.), sec. 205; Black's Pomeroy on Water Rights, secs. 138, 140, and cases there cited.

This agent of the state, the defendant, had an unquestionable right to take from the stream so much water as was reasonably necessary to supply the natural wants of those living upon this tract of land. The evidence does not indicate any necessity for the use of the water to operate a fountain. The defendant was not warranted in taking water for the manufacture of ice to be sold away from the premises. The first and second specifications of error are sustained.

The witness, Henry H. Miller, having been permitted by the court to testify that the supply of water at the plaintiff's mill was diminished about the time of the erection and occupancy of the defendant's buildings, and that the rental value of the mill was thereby decreased, it was competent for the defendant to ask him on cross-examination any question which tended to throw light upon the knowledge which witness had of the facts, or show the conditions which had resulted in the diminution of the supply of water, and whether the defendant was responsible for those conditions. The sixth specification of error is sustained.

The judgment is reversed and a venire facias de novo awarded.