## MONONGAHELA NAVIGATION COMPANY <em>v.</em> COON et al.

A charter to make a lock navigation in a public stream is a contract; and the legislature cannot, by a subsequent law, give a remedy for damages where there was no remedy under the charter. But where a supplementary charter has been accepted, in which a power is reserved to'alter and amend the charter, so as to do no injustice to the stockholders, a remedy for damages already done may be given by the legislature.

A company under a charter to make a lock navigation in a public stream, has not the same privilege as a riparian owner, but must pay for all damage done to the property of others when required to do so by the terms of its charter; and injuries resulting from the swelling of the river, during floods, which is increased by the erection of their dams, are within the law giving compensation for all injuries occasioned by overflowing the lands lying on the stream or its tributaries, or impairing the usefulness of any mill-dam, &c., situated thereon.

In error from the District Court of Allegheny county.

*Sept.* 13.   The defendants in error were owners of a mill-dam, &c., on the Youghiogheny, which is a branch of the Monongahela.

Under the charter in the acts of 1836 and 1839, the plaintiffs in error had erected dams in the latter river, and the present case was an action to recover damages consequent thereon.

The plaintiffs in error were chartered under the act of 1836, and authorized to erect a lock navigation in the river Monongahela, making amends for the damages thereby occasioned.   On the 24th of June, 1839, a supplemental act was passed, in which new privileges were granted; the last section, reserving to the legislature "the right to alter, amend, or annul, the charter, in such manner as to do no injustice to the stockholders." It appeared to be conceded this act was accepted by the company.   In 1842, the com-

pany erected a dam in the Monongahela, four miles below the mouth of the Youghiogheny. The defendants' mills and mill-dam were on this river, six miles above its junction with the Mononga-hela. In 1843, (6 Watts & Serg. 101,) it was decided that the plaintiffs below had no right of action for injuries to their property resulting from the erection of this dam. In 1844, it was enacted, that the company *shall* make amends for any damages *done*, or that may be done, to lands and property on the Monongahela river, or its branches or tributary streams, by overflowing the same; and that the act of 1836 shall not be construed so as to impair the right or privilege heretofore granted by acts of Assembly, authorizing the erection of dams on any of said branches or tributary streams; nor so as to permit the company to injure or affect injuriously the usefulness of any mill-dam or mill erected on or near such branches or tributaries without making compensation. The Youghiogheny had been previously declared a public highway; and by an act of Assembly, the erection of dams was allowed in certain public streams, including this one.

The defendants in error, under the act of 1844, had instituted proceedings to ascertain the damages by an inquest, from which the plaintiffs in error appealed, and the cause came on for trial before GRIER, P. J. The defendants below gave evidence that the comb of their dam was, by actual measurement, eighteen inches below the level of plaintiffs' mill-wheel and water line; and upon this submitted to the court, as a point on which instructions were asked, that if the dam of the company was below the line of plain-tiffs' land, so that no water was backed thereupon at the ordinary stage of the river, the company were not liable. This his honour negatived, saying, they were bound to make compensation if the erection of the dam impaired the usefulness of plaintiffs' mills, by causing the water to flow back upon it; the erection of the dam by the company, backing the water as much *by a rise* in the river of six inches, as a rise of ten or twelve feet above the ordinary stage of water would have done in the natural state of the river. This, with the questions as to the defendants' liability under the acts of Assembly, were the errors assigned.

*Williams*, for plaintiffs in error.—The present case involves the assumption of the most unwarrantable exercise of power on the part of the legislature. It had been previously settled between these very parties, that there was no injury recognised by the law, resulting from the acts of the company; it was *damnum absque*

*injuria.* Subsequently to that decision this act was procured, which, being retrospective, is to receive the strictest construction.

It will therefore be found not to cover this case. It declares the charter shall not be construed to impair any right granted by act of the legislature. This was not the plaintiffs' case. The act allowing the erection of a dam in the Youghiogheny, not giving a right, but merely taking away the penalty for the exercise of a right. It would be grossly unjust to render the company liable by this retroactive legislation, for acts lawful at the time; and hence, a prospective construction merely should be put on the act of 1844: Underwood *v.* Lilly, 10 Serg. & Rawle, 97. Independent of the constitution, it is against common right to give such an action: Lambertson *v.* Hogan, 2 Barr, 22; Dash *v.* Vankleek, 7 Johns. 497; Osborne *v.* Huger, 1 Bay. 179; Wilkinson *v.* Leland, 2 Peters, 658; Story's Com. on Const. sect. 1393; O'Conner *v.* Warner, 4 Watts & Serg. 227; Menges *v.* Wertman, 1 Barr, 218; In re Albany Street, 11 Wend. 151; Varick *v.* Smith, 5 Paige, 137; Bonaparte *v.* Camden Railroad, Bald. 220; Norman *v.* Heist, 5 Watts & Serg. 571. Under the constitution the case is stronger; a charter is a contract: Dartmouth *v.* Woodworth, 4 Wheat. 625. And like any other contract with the state, its obligations are impaired by any deviation from its terms: Ibid; and Fletcher *v.* Peck, 6 Cranch, 137; 3 Story's Com. on Const. sect. 1379; Green *v.* Biddle, 8 Wheat. 1; New Jersey *v.* Wilson, 7 Cranch, 164; Tenet *v.* Taylor, 9 Cranch, 45; 1 Kent's Com. 20, 446; Bill of Rights, sect. 10.

*Loomis* and *Hampton*, contrà.—There is no attempt to review any decision of this court. The act of 1844, which gives the remedy, was not then in existence, and the right to pass that law was expressly reserved by the supplementary charter of 1839. That there was a prior moral obligation to make compensation for these injuries, cannot be questioned; and the power to add a legal sanction to such an obligation, is recognised in Menges *v.* Wertman, 1 Barr, 218.

*Sept.* 25. GIBSON, C. J.—If the constitutionality of the declaratory act depended on the provisions of the original act of incorporation, we would be bound to pronounce against it. A charter to execute a public work, which can only be accomplished by the state, or an agent acting by its authority, is essentially a contract between the state and the agent; and the principle needed not the decision in the

Dartmouth College case to establish it. The wonder is, that it happened to be controverted. The state itself is answerable for private damage no further than it is expressly made so by the provision of the constitution which forbids private property to be taken for public use, without compensation made for it. A grant of this eminent domain, so far as it is not specially restricted, passes the immunity from responsibility which pertained to it while it was in the hands of the state; and a corporation invested with it, being the *locum tenens* of the state, is liable to consequential damage to private property no further than it is declared to be so in the act of its incorporation. In other words, the state is bound to defend its servant as far as it could defend itself, unless the terms of the contract restricted the claim to protection when it was made. Such is the law as it stood on the constitution of 1790, to which the framers of the amended constitution have added a provision requiring a corporation or natural person, invested with the power of the state, to make compensation for private property, or give security for it, before it be actually taken for public use. And this difference between the agents of the state and the state itself, which is the only one peculiar to the instrument as it stands, has no relation to consequential damage. Now it has already been determined that the case before us was not provided for in the original act of incorporation; and had it continued to stand on that foot, the power of the state would have been incompetent to burden the company with charges not originally imposed on it. But in 1839, it accepted a grant of further powers and privileges, in consideration of an express reservation by the legislature of a power "to alter, amend, or annul the said charter of said company, at any time thereafter, in such manner that no injustice be done to the said corporation;" and, in execution of it, they declared, in 1844, that the company "shall make amends for any damage done, or that may be done, to lands or property lying upon the Monongahela river, or its branches and tributary streams, by overflowing the same." It is evident, that by accepting additional privileges and powers on the terms prescribed in the grant of them, the company surrendered the inviolability of its contract to the discretion of the legislature. How this discretion has been exercised it is not for us to say; but if we were bound to do so, we would promptly say that it has, in the words of the declaratory act, done no injustice to the company.

It is contended, however, that conceding the constitutionality of the act, yet, as the surface of the pool made by the dam is lower

than the surface of the stream at the defendants' line, and as the water consequently does not flood his mill or land, when the river is at its ordinary pitch, the company is not answerable for damage done to the property by floods, though the dam may contribute to the cause of it. It is certainly true, as contended, that a riparian owner is entitled to swell the water in the channel of the stream, in its natural state, up to his neighbour's line; and that he is not answerable for damage done by high water, however it may have been increased by the obstruction below. The reason of the rule is, that as damage from floods may be increased by almost any obstruction whatever, it is inseparable from even a reasonable use of the stream in a way to produce the greatest benefit to all the riparian proprietors. If it were otherwise, the whole power created by the descent of the stream within the limits of each, could not be used by any of them, as a considerable margin would have to be left by each to prevent his dam from swelling the water back upon his neighbour in times of flood. It is better for all, however, that the whole power of the stream should be turned to account, than that particular damage on extraordinary-occasions should be prevented by sacrificing part of it. The rule is founded in general policy and convenience, being found to be productive of the greatest amount of general good. This company, however, is not a riparian owner, and cannot claim the privilege of one. It has no right to swell the water at all but what it derives from the act of its incorporation; and it is bound to pay the price which the legislature has set upon it. Now, what is that? It is compensation " for *any* damage done to lands or property." True, it was said in the Lehigh Bridge Company *v.* The Lehigh Navigation and Coal Company, 4 Rawle, 9, that a loss incurred from an act of Providence, is not to be borne by one whose superstructure has been, without negligence on his part, the passive and immediate instrument of it; and that the defendant there would not have been liable had the flood torn the timbers of his dam from their foundations, and driven them against the plaintiff's bridge with such violence as to sweep it away, unless its agents had left them improperly secured. Here, however, the defendant's dam was not the immediate and passive instrument of the mischief, but the remote and active cause of it; and no question of negligence could be connected with it. In that case, too, the act of incorporation made the company liable for consequential damage on the principles of the common law: in this, it makes it liable for any damage whatever. It was framed to give

remedy in the very case before us; and it would be a perverse interpretation of it that would so direct its aim as to make it miss the mark. The result of the whole is, that the cause was properly put to the jury.

Judgment affirmed.