## City of Reading *versus* Althouse.

1. By the Act of April 14th 1853, applying to the " Reading Water Company," it was provided that where the corporation permanently appropriated to its use such springs or streams as it might select for water purposes, compensation should be made to the owners for damages sustained.  *Held*, that this act applied not only to the owners of natural channels, but to those who owned artificial watercourses which had been used from time immemorial.

2. In 1769 L. owned certain lands, through which flowed a stream and upon which land was an existing ditch which the stream fed with water for the purpose of irrigating the land.  He divided the lands and devised them, allowing to each portion the use of the water from the ditch at stated intervals.  A. derived title through L. to one of these portions.  In 1874 the city of Reading, which is situated on one of the tributaries of the stream from which the ditch is supplied, diverted the water from this tributary for the use of the city.  In an action by A. for damages, *Held*, that the action would lie under the Act of April 14th 1853.  *Held, further*, that section 8, article 16, of the new constitution protects such an owner, as that section provides for the making of compensation not only for the taking of private property for public use, as was the case theretofore, but also for its injury or destruction.

3. The doctrine that an action for consequential damages against a corporation possessed of the right of eminent domain cannot be sustained is reversed by the new constitution, which has provided a different rule.

March 4th 1880.  Before SHARSWOOD, C. J., GORDON, PAXSON, TRUNKEY and STERRETT, JJ.  MERCUR and GREEN, JJ., absent.

Error to the Court of Common Pleas of *Berks county :* Of January Term 1880.  No. 247.

This was an appeal by the City of Reading from the judgment of the court confirming the report of viewers to determine what damages William Althouse had sustained by reason of the taking of water by said city for its uses.

The City of Reading purchased the property and franchises of the Reading Water Company in 1865.  Prior to this time the city had purchased a tract of land, known as Ohlinger's Mill, through which the Ohlinger stream flowed.  In 1872, the city councils passed the necessary legislation to authorize the water department to bring in the waters of the Ohlinger creek from a point on the city tract, near the Ohlinger mill, to the city reservoir.  A dam was built and pipes laid from it to the reservoir, and in July 1874, the water was diverted from the stream.  William Althouse owns a farm in Exeter township, some five miles from the point of diversion.  He claimed damages for the loss of water used in irrigating

[City of Reading v. Althouse.]

his meadows.   This water does not flow into his land through its natural channel, but is diverted from its natural channel into an artificial irrigating ditch at a point on the stream about four miles from the city dam and one mile above plaintiff's farm.   This ditch irrigates the lands of a number of persons, and existed in 1769. It was not known when it was made.   It was used for the purpose of irrigating the lands of Mordecai Lincoln.   The water was derived from the Antietam creek.   Lincoln devised these lands, having previously divided them, and assigned to each its proportion of the water, to be used for irrigation, and arranged that each portion should have a certain period of time in which to use the water.   Althouse derived title from Lincoln, with the right thus to use the water from the ditch.   The Ohlinger c reek is a tributary of Antietam creek.

The proceedings were under the supplement of April 14th 1853 (Pamph. L. 416) to the Act of March 16th 1819, creating the "Reading Water Company," and authorizing it to supply the borough of Reading with water.   The 4th section of the supplement of 1853 provided, "That the Reading Water Company shall have power and are hereby authorized from time to time hereafter, as they shall deem necessary, permanently to appropriate to their use such spring or springs, stream or streams of water as they may select, for the purpose of bringing into the city of Reading an additional supply of water; and any damage sustained by the owners of land upon which such spring or springs, stream or streams of water is or are situated, or through which it or they shall flow, by reason of the permanent appropriation as aforesaid, shall be ascertained, and compensation made in the manner hereinafter provided."

There was considerable conflicting testimony as to the damages which had been occasioned by the diversion of the water.

The plaintiff offered to show: 1st.  "The effect of the appropriation of the Ohlinger or Antietam creek by the city of Reading upon the quantity of water flowing through the race or watercourse in question from the first day of March to the sixteenth day of October; that the quantity of water flowing through said race or watercourse is by said diversion reduced to such extent as to make it unprofitable for the parties owning the land there along to be at the expense of keeping it in repair, and as to utterly ruin and deprive the plaintiff of his right and power to irrigate his land.

2d.  "To show further the number of acres of irrigable land the plaintiff owned at the time of the diversion, and the number of acres owned by him generally along this race, and the amount of damages accruing to him from said diversion and decrease of quantity of water, and the difference between the value of the farm

[City of Reading *v.* Althouse.]

immediately prior and immediately subsequent to such diversion, and that said farm was depreciated in value."

Defendant objected that, " The plaintiff has already shown that the creek or stream appropriated by the city does not flow through his land, but that at a point more than a mile above his farm and four or five miles below the point of diversion by the city, water is diverted from the Antietam creek during certain portions of the year into an artificial channel, and that he has, by deed, the right to use water from this channel during certain hours in each week. The Act of Assembly under which this proceeding is had does not authorize the assessment of damages for any such right of irrigation, and the evidence is therefore irrelevant and inadmissible."

Objection overruled, and evidence admitted.

3d. " To show by Daniel S. Zacharias, the witness upon the stand, that the water of the stream which he has testified the city of Reading diverted and brought into the city in July 1874, before that time flowed through the race mentioned in the deeds already in evidence, and that the said race runs through the lands of the plaintiff described in the petition ; proposing to follow this with proof of the fact that plaintiff had been using said water for the purposes of irrigation, watering cattle and domestic purposes, and by proof of damages."

Defendant objected :

1. " Because the race spoken of is an artificial channel, and not the natural channel of the stream. The right of the plaintiff, if any exists, is an easement. The act under which the damages are claimed does not allow damages for injury to an easement such as this.

2. " The creek diverted by defendant was only a branch of the Antietam creek, which was taken at a point four or five miles from the head of the race ; the testimony is therefore uncertain and speculative.

3. " The petition only claims damages for loss of water for irrigation. No loss of water for that purpose has been shown."

Objections overruled, and evidence admitted.

The following points were submitted by defendant, to which the answers of the court, Sassaman, A. L. J., are appended :

1. That the Act of Assembly under which these proceedings are had does not authorize the assessment of damages for the injury complained of by plaintiff, and therefore the verdict must be for defendant.

Ans. " Negatived."

2. If the jury believe that there remained after the city took the Ohlinger water, sufficient water in the Antietam creek to irrigate the plaintiff's meadows, then the plaintiff has not sustained any

[City of Reading v. Althouse.]

substantial injury, the doctrine *damnum absque injuria* applies, and the plaintiff cannot recover.

Ans. "If the jury believe, that although the petitioner in this case is deprived of some of the water he had a right to, and of a right he should have had and enjoyed, and yet, that the amount so taken from his use for the purposes of his grant was not appreciable, or slightly appreciable only, then this case falls under the doctrine of *damnum absque injuria*, and in that event, there can be no recovery here now. But if the loss of water to which he is entitled would be appreciable, and material to the enjoyment of his right, the jury may assess damages which would be commensurate with the actual depreciation of his farm, the direct and immediate result of the deprivation of water by the diversion of the stream, and only for that."

The verdict was for Althouse for $2150, when the city took this writ, and alleged that the court erred in admitting the plaintiff's offers, and in the answer to the defendant's first point.

*C. H. Ruhl* and *George F. Baer*, for plaintiff in error.—The plaintiff below did not claim compensation for injury done to him as a riparian proprietor, but for diminishing the flow of water in an artificial irrigating ditch, constructed from his land over the lands of other persons to the stream, and from which ditch he could use water a certain number of hours in the week during half the year, to irrigate his meadows. This right is set forth in his deed, and is not that of a riparian proprietor, but constitutes a mere easement : Northam *v.* Hurley, 1 E. & B. 670.

The Act of April 14th 1853, gives compensation to riparian owners, and the right of the latter is limited to natural streams, and does not attach in the case of artificial cuts or drains : Sampson *v.* Hoddinott, 1 C. B. N. S. 590.

A corporation invested with the power of eminent domain, is liable to consequential damages to private property no further than it is declared to be so in the act of its incorporation : Canal Co. *v.* Mulliner, 18 P. F. Smith 360 ; Navigation Co. *v.* Coons, 6 W. & S. 101.

The constitutional limitation applies only to an actual taking of property, and the word taking, is to be construed in its natural significance. Matters of annoyance, indirect and consequential injuries to property, and acts tending to depreciate the value, but which do not amount to a real "taking" are outside of the constitutional provision : Watson *v.* Railroad Co., 1 Wright 479 ; Tinicum Fishing Co. *v.* Carter, 11 P. F. Smith 31. The damages to the plaintiff are entirely consequential. They are necessarily so, and similar damages have been so adjudged in Koch *v.* Williamsport Water Co., 15 P. F. Smith 288.

The owner of land contemplated by the statute was the owner

[City of Reading v. Althouse.]

of the bed of the stream, and not the owner of a ditch leading from the stream. Damages could be multiplied indefinitely, if every riparian owner could grant the right to divert water from the stream on to his neighbor's lands, and thereby give them the right to compensation for injury to such easement. Damages have been denied parties for injuries to similar rights, but more meritorious and permanent: N. Y. & E. Railroad Co. *v.* Young, 9 Casey 175; Arnold *v.* Hudson Railroad Co., 49 Barb. 121.

*Jacob S. Livingood* and *Cyrus G. Derr*, for defendant in error. —Where the owner of lands through which a stream of water flows divides the stream, making two streams of one, and grants lands abutting upon the new stream, the grantee of such lands becomes a riparian owner: Nuttall *v.* Bracewell, 2 Exch. Law Rep. 12; Sutcliff *v.* Booth, 32 L. J. Q. B. 136; Stockport Waterworks Co. *v.* Potter, 7 H. & N. 160. When the city appropriated the stream, it was a *taking* of Althouse's property. The damages, therefore, are not consequential but direct: Hough *v.* Doylestown, 4 Brew. 333; Hecksher *v.* Shenandoah, 2 Leg. Chron. 273; Gardner *v.* Village of Newburg, 2 Johns. Ch. 162. The stream flowed through Althouse's land, and whether through an artificial or natural channel, makes no difference: Seibert *v.* Levan, 8 Barr 390.

Whether the damages claimed by Althouse are consequential or direct, the city of Reading is bound under sect. 8 of art. 16 of the Constitution of 1874, to compensate him for them. The Constitution of 1838, provided compensation only for the *taking* of property. The New Constitution provides compensation for the taking, injury or destruction of property.

Mr. Justice GORDON delivered the opinion of the court, March 22d 1880.

Were it necessary we would have no hesitation in holding that the provisions of sect. 8, art. 16, of the New Constitution, governs this case. That section provides for the making of compensation, not only for the *taking* of private property for public use, as was the case theretofore, but also for its *injury* or *destruction*. That the use, which the plaintiff made of the waters of the Great or Antietam creek, through the race or ditch in controversy, was property, though of an incorporeal kind, is not open to debate; and that it was injured by the operations of the city of Reading, is a fact established by the proper tribunal. There is, therefore, no good reason, apparent to us, why the case should not be covered by the above-recited eighth section of the Constitution.

Passing, however, this phase of the question, we cannot see why the plaintiff is not within the protection of the Act of April 14th

[City of Reading v. Althouse.]

1853, Pamph. L. 416. This act provides, that "Any damages sustained by the owners of land upon which such spring or springs, stream or streams of water, is or are situated, or through which it or they shall flow, by reason of the permanent appropriation as aforesaid, shall be ascertained and compensation made in manner hereinafter provided for."

Now, the defendant has appropriated Ohlinger creek, one of the main branches of Antietam, from which the irrigating ditch or race in question receives its supply. The determinative question then is, did this stream of water, or what is the same, the water of this stream called Ohlinger, or any material part of it, before it was diverted by the city of Reading, flow through the plaintiff's land? The channel may be called what you please: Antietam creek or Lincoln's ditch—that is of no consequence; was the water formerly wont to flow through the Althouse property? If so, he had property in it; a right to it which is protected by the act. The counsel for the defendant seems to think that the provisions of the act extend but to the owners of the natural bed and banks of the stream, but this is a construction warranted neither by the letter nor spirit of the statute. Who would doubt the application of the act were this ditch a natural branch, division of, or outflow of the main stream? But what radical difference is made by the fact, that man dug the present channel instead of nature? And how can this affect vested rights, rights now more than a century old? In the submission executed by the two Lincolns and Michael Seyster, one hundred and eleven years ago, this ditch is spoken of as an existing race or watercourse; but who dug it, or how long it existed before that time, is not mentioned, and no one now knows. Its origin is literally buried in the shades of the past, hence, for all practical purposes it is a natural watercourse; prescriptively and, therefore, legally it is so. The right to it could be no better were it natural. As was said by Chief Justice GIBSON, in Seibert v. Levan, 8 Barr 383, "Whilst the grantor was lord of the whole, he might assign a permanent channel to the stream, and as regards himself and those who claim under him, impress it with any character he should see proper. There is no particular sanctity in the natural bed of a stream, which is perpetually changing its course from accidental causes." And in speaking of the rule that water shall flow *ubi currere solebat et consuevit*, he says, it applies rather to the duty of returning it, than to the channel through which it flows. And so in Sutclife v. Booth, 32 L. J., Q. B. 136, it was held, per Wightman, J., that a watercourse, though artificial, may have been originally made under such circumstances, and have been so used as to give all the rights that the riparian proprietors would have had, had it been a natural stream.

Of like import is the case of Nuttall v. Branwell, Law Rep.,

[City of Reading v. Althouse.]

2 Exch. 1; in which Channell, B., says, "I see no reason, why the law applicable to ordinary running streams, should not be applicable to such a stream as this, for it is a natural flow or stream of water, though flowing in an artificial channel." So, also, on a similar footing he puts the case where two adjoining riparian owners should, by agreement, so alter or divert a stream that it shall run in two channels instead of one. In such case he holds, that a grantor of land on the new stream would have all the rights of a riparian owner.

But the case here supposed is, in fact, the one in hand; here is a division of the Great creek, by the race or water-way in controversy, and that of a date so ancient that the memory of man runneth not to the contrary. So far as the case of the Stockport Waterworks Co., 7 H. & N. 160, has any application, it is an authority for the plaintiff, for Pollock, C. B., advocates the doctrine above stated.

We may then set it down for certain that, so far as authority goes, the ruling of the court below is sustained.

Many cases have been cited upon part of the city, for the purpose of proving that an action for consequential damages against a corporation possessed of the right of eminent domain, cannot be sustained. But these authorities are now of no value, for the new constitution has introduced a different rule. Moreover, the Act of 1853 governs this case, and it, in express terms, provides for compensation to land-owners for *any* damage they may suffer, not for land taken, but for the taking, "permanent appropriation" of water. The damages are thus necessarily consequential, as they arise from the disturbance or abridgment of an incorporeal right.

Judgment affirmed.