ALLEN v. THORNAPPLE ELECTRIC CO.

WATERS AND WATERCOURSES—RIPARIAN PROPRIETORS—RIGHTS—DAMS—FLOODING.

The owner of land bounded by a stream is entitled to have the water enter and leave his premises in the natural and ordinary way at all times, as well during times of ordinarily high water as during times of ordinarily low water, and a lower proprietor who interferes with that right by building a dam is liable for the damages occasioned, though his dam is not as high as low-water mark at the lowest point of the upper proprietor's land.

Appeal from Barry; Smith, J.  Submitted April 6, 1906. (Docket No. 18.)   Decided June 5, 1906.

Bill by Thomas R. Allen and Susan Allen against the Thornapple Electric Company to enjoin the maintenance of a dam.  From a decree for complainants, defendant appeals.  Modified and affirmed.

*Hartley E. Hendricks, Milton F. Jordan,* and *Thomas Sullivan,* for complainants.

*Colgrove & Potter,* for defendant.

HOOKER, J.   The complainants are owners of 67 acres of land, most of which is bounded on the east by the Thornapple river.   The stream is tortuous, having banks upon complainants' premises approximating a mile long. It is shown that there is considerable bottom land adjacent to the river, in all about 23 acres.   The defendant purchased a dam site at La Barge, 6 miles below the complainants' farm (where there had previously been a dam 7 feet high), and some rights of flowage, which are said to permit the raising of the dam to 18 feet from low-water mark at a point 300 feet below the new dam.   The defendant admits that it built a new dam 15.59 feet high above low-water mark at La Barge, so constructing it that by the use of slash boards, it could be raised to 18 feet.   It does not appear that it acquired any rights of flowage upon the complainants' land, and it is claimed on its behalf that before building its dam, it caused levels to be taken which, as reported by its surveyor, showed that a dam 20 feet high would " pond the water " as far up as the Stauffer bridge, which was two miles down the stream below the north line of complainants' land.   The bill was filed to restrain the maintenance of the dam, and incidentally to recover damages for injury to complainants' land.

There is no proof that the dam is higher than low-water mark at the north line of the complainants' land, but the

bill alleges that, in times of freshet, the dam so obstructs the flow of the stream that the low lands are submerged and injured by water and ice. The learned circuit court judge who heard the cause found that this allegation was true, and rendered a decree accordingly, and the defendant appealed. The defendant contends that it has a right of flowage, which permits a dam 20 feet high, and that the complainants cannot complain so long as it does not raise the water at their premises at its ordinary stage. A map was put in evidence, by the defendant, which shows levels from the point called datum, 300 feet below the dam, to various points upon the complainants' premises. From this we are able to determine that the lowest point of the land is 17.40 feet above datum, other measurements are 18.30, 18.50, 18.60, 18.70, and they run as high as 23.30 feet. There are two levels which show 24.20 and 24.30, but the most of them are below 21 feet, and many below 19 feet. It is complainants' claim that, when the freshets come, all of the water in the pond below the level of the dam, is dead water, and an obstacle to the flow of the water coming down from above, and that the consequence is a much greater rise at their premises than would occur if there was no impediment to the flow of the water along the bed of the stream, and that as a consequence their land is not only overflowed but is saturated with water, which it would not otherwise be. The circuit judge has so found, and we are of the opinion that the proof warrants the finding.

The defendant admits that the dam proper is 15.59 feet high, and its manager stated that it was 16 feet high. If by this is meant 16 feet high above datum it is one thing, but if 16 feet above the bed at the point where the dam is located, it may be quite another, for datum is necessarily some and perhaps considerably lower than low water at the dam. It is admitted that, with the flashboards in place, it would pond the water back to the bridge, a distance below complainants' north line, at an ordinary stage of water, by which we understand is meant ordinarily low

water. The evidence on the part of the complainants tends to show some two or three feet more of water at the bridge or ford in times of ordinary low water, and when we consider the volume of the stream, which is naturally a rapid one, and which, under existing conditions, enters at the bridge, on a level of six miles, whereas in its natural state there was a fall of 18 feet between that point and the dam site, it is self-evident that the velocity of the current must be lessened, and that the swifter current above must deliver the water more rapidly than it can be delivered at the dam, and the inevitable result must be a rise of the water above. How far up the stream such rise will be apparent must depend upon the distance necessary to increase the depth of the pond sufficient to establish an equilibrium between the volume of the stream above and the overflow at the dam. Whatever this rise is upon complainants' land, if any, in ordinary low water, it is an invasion of their rights, and could be recovered for if it has damaged them, if their bill had made claim for such damage.

But the cause for suit alleged is that they are damaged in times of freshets, their claim being that the ponding of the water affects their premises at all times, but especially when the stream is swollen, and that the defendant is at such times liable for the consequences of its ponding the water. To this the defendant replies that it is not responsible for the consequences of freshets, and its counsel cite the case of *Richards* v. *Peter*, 70 Mich. 290, to the proposition that it has the right to back the water to complainants' north line, and that so long as it does no more, there is no liability, whatever consequences may ensue. If a proper interpretation of the case of *Richards* v. *Peter*, supra, warrants defendant's claim, it stands practically alone and unsupported. On principle we must say that the owner of land is entitled to have the water enter and leave his premises in the natural and ordinary way at all times, and this rule applies to ordinary low water and ordinary high water. Subject to this the owners, above

and below, may use the water for their own purposes. But the lower proprietor may not raise the bed of the stream below to a level for six miles, where previously there was a fall of 18 feet, either by filling with earth or a dead wall of water, thereby causing the accumulation of a head above to the injury of his neighbor, even if such effect is slight or imperceptible except in seasons of rain. He must act with reference to all ordinary stages of water and all seasons, and the exception relates only to those extraordinary and abnormal conditions and floods, which, if known before, at least occur only on rare occasions. Such was the limitation placed upon a similar case in Pennsylvania, that of *Monongahela Navigation Co. v. Coon,* 6 Pa. 383, and the later case of *McCoy v. Danley,* 20 Pa. 88. See, also, *Michigan Paper Co. v. Electric Co.,* 141 Mich. 48.

We must assume that it was such freshets that the court had in view in *Richards v. Peter,* supra, and that it did not intend to hold that a lower proprietor was entitled to take away the opportunity for the discharge of water from an upper proprietor, so that every increase in the volume of the stream would necessarily flood, to a greater or less extent, the lands of his adjacent upstream neighbor. See *Whitney v. Wheeler Cotton Mills,* 7 L. R. A. 614 (151 Mass. 396), note; *Barnard v. Shirley,* 41 L. R. A. 749 (151 Ind. 160), note; *Avery v. Electric Co.,* 59 L. R. A. 876 (75 Vt. 235), note. We do not discuss at length the many cases, cited in these notes, which sustain the rule that a dam owner will be liable if, in the ordinary times of high water, the overflow passes his neighbor's line. See *Dorman v. Ames,* 12 Minn. 451; *Ames v. Manufacturing Co.,* 27 Minn. 245. For late cases, consult 4 Current Law, p. 1826, and note.

The defendant's counsel call attention to certain evidence showing that, by extensive dredging and draining in adjoining counties, the volume of water in Thornapple river has been materially increased. How far we would be justified in taking judicial notice of the fact that much,

if not all, of this work was after the year 1903, when this suit was commenced, we need not determine. It is enough to say that it is not shown that it was not after that time that this increase began. We are convinced that the complainants' land has been injured by the defendant's dam. If, as the complainants claim, the flashboards were in place at the time, we would think that their removal in times of high water would do much to lessen the damage, possibly it could prevent any. If, however, the flashboards were off, as the defendant's testimony tends to show, it is manifest that adequate wasteweirs, or gates, to relieve the flood were not provided. Before the decree was rendered, the dam went out. We construe the decree to mean that the court found that the complainants had sustained damages to the amount of $150, and that if the defendant should elect to rebuild its dam to a less height, so that it would not thereafter affect the stream at complainants' premises, that sum, with costs, should be the limit of their recovery, but, if defendant should elect to rebuild its dam to the former height, they should recover the sum of $1,000, and that the defendant should thereafter have the right to flow such lands by such dam. The decree has not in terms provided for an injunction against the maintenance of the dam. It has, however, placed a condition upon its erection, viz., the payment of $1,000 to the complainants. This was doubtless upon the theory that complainants, having sought relief in equity, should do equity, and accept reasonable compensation for past and future damages, instead of requiring a disproportionate sacrifice by the defendant, through the crippling of its water power and business.

We are of the opinion, however, that the damages allowed are excessive. The evidence does not show that the land is rendered useless. It will have a material value for farming purposes much of the time, and we think $690 ample compensation for all past and prospective damage to said land from the dam in question. To us it seems obvious that the maintenance of the dam at 15.59 feet in

height has been and will continue injurious to the complainants, and that its effect has been to raise the water in times of freshet upon their land at least two feet. It is not improbable that it raised the water more than that. We are of the opinion, therefore, that the height of the dam should be reduced to 14 feet above datum, hereinbefore referred to, and that complainants recover $150 damages, unless defendant shall pay, or tender to the complainants or their solicitor, the sum of $690, within 90 days after notice of this decree, which sum, if paid, shall be in full payment for the right to flow the said, bottom lands of said complainants, heretofore and hereafter, by a dam of the height heretofore maintained by the defendant. The case of *Blake* v. *Cornwell*, 65 Mich. 467, warrants such a decree.

The decree will be modified in accordance with the opinion; the defendant to recover costs of this court.

GRANT, BLAIR, MONTGOMERY, and OSTRANDER, JJ., concurred.