LORANGER v. CITY OF FLINT.

1. WATERS AND WATERCOURSES—RIPARIAN RIGHTS—MUNICIPAL COR-
PORATIONS—WATERWORKS—DIVERSION OF WATER—DAMS.

On an appeal from a decree of the circuit court enjoining
defendant municipal corporation from diverting water
from defendant's millpond in excess of the quantity
fixed by the decree which defendant was entitled by ad-
verse user to divert, by an equal division of the court
the decree is modified and affirmed by denying injunctive
relief and remanding the case to the lower court for a
determination of the damages on the ground or theory
that the municipality has no such paramount right to
the use of the water as to entitle it to divert a part of
the flow of a navigable river for domestic purposes.

2. SAME—DAMAGES—COMPENSATION—POWER RIGHTS.

Without compensation to be paid, the waters of a stream
cannot be diverted for municipal purposes to the injury
of a riparian owner who is entitled to power rights in
a river and maintain a dam and a mill operated thereby.[1]
BROOKE, C. J., and McALVAY, KUHN, and STEERE, JJ., dis-
senting.

3. SAME—WATERS—DAMAGES.

In determining the damages to be allowed to a mill owner,
whose ancestor sold property along the river to the de-
fendant city for waterworks, and who tacitly consented
to the use made of the water supply, for municipal pur-
poses, the basis should be the amount diverted at times
when complainant's requirements for power purposes
were affected, not the total volume consumed nor the
water diverted when complainant's power requirements
were amply met by the remaining flow of the stream.
Per STONE, OSTRANDER, BIRD, and MOORE, JJ.

Appeal from Genesee; Withey, J., presiding. Sub-
mitted June 3, 1914. (Docket No. 9.) Decided April
19, 1915.

---

[1] As to the right to divert water from nontidal stream for
water supply purposes without compensation to owner, see note
in 37 L. R. A. (N. S.) 312.

Bill by Minnie Loranger against the city of Flint to restrain defendant from diverting water from complainant's mill pond. From a decree for complainant, both parties appeal. Modified and affirmed.

*Carton, Bray & Stewart,* for complainant.

*Homer J. McBride (Brennan, Cook & Gundry,* of counsel), for defendant.

The complainant in this cause is the owner of a milling property and water power situated upon the Flint river, near the business center of the city of Flint. She inherited the property in question in 1899 from her father, William Hamilton. Her right to maintain her dam across the Flint river is derived from an act of the sixth legislative territorial council, approved March 30, 1835, entitled "An act to authorize the building of a dam across the Flint river." Territorial Laws of Michigan 1834-35, p. 200. The act provides for the location of the dam at a point certain, and further provides that said dam shall not exceed five feet in height above common low water, and shall contain a convenient lock for the passage of boats, barges, canoes, rafts, and other watercrafts, not less than 90 feet in length and 16 feet in width. It further provides that nothing in the act contained shall be construed as giving to said grantees the right of flowage on lands belonging to the United States or any person without the consent of the United States or such person or persons, or in any manner interfering with other mills theretofore erected, and reserves the right to alter and amend the act at any time.

This dam has been continuously maintained since the grant, and power generated by the use of the impounded waters is at the present time employed in the operation of a grist mill with a capacity of about 200 barrels a day.

In the year 1883 a waterworks system for the city of Flint was established by a private company under a 30-year franchise obtained from said city. Complainant's father, William Hamilton, was for a great many years president and general manager of said company. When first established, the plant of the water company was located at a considerable distance below Mr. Hamilton's dam. Several large wells were dug in the expectation that a sufficient supply of pure water would be obtained to enable the water company to carry out its contract with the city. In this the city was disappointed, as the water obtained was sufficient in neither quality nor quantity. After much negotiation between the company and the city, the company moved its plant from its location below the dam to a point about one mile above the dam and upon the banks of the pond. There a site was selected by William Hamilton, the owner of the dam and water power, and he sold to the water corporation 2.65 acres for a consideration of $352.45. The deed to the company, dated March 1, 1890, conveyed no rights to draw water from the pond, although the company became, by force of the deed, a riparian owner. In 1903 the city, under the provisions of the franchise granted to the company, elected to purchase the waterworks system and property. The property was deeded by the water company to the city on December 1, 1903. No reference is made in said deed to water rights. After the location of the pumping plant above complainant's dam, the water, though sufficient in quantity, was unsatisfactory in quality. Typhoid fever became frequently epidemic, which the health authorities attributed to the pollution of the city's water supply by reason of sewage in the millpond. Agitation for a better supply continued until in April, 1909, when a resolution was adopted authorizing the mayor to appoint a commission for the purpose of

investigating and reporting to the common council upon all questions for the betterment of the waterworks, plant, and property, extension of its mains, and providing for the inhabitants of the city an adequate supply of pure and wholesome water. As a result of the report of the water commission, it was determined by the city to establish a filtration plant in connection with its pumping plant. It was also determined to change the site of the pumping plant to a point a mile or more above the old plant, but still within the city and at a point well within the limit of complainant's millpond, which backs the water up for a distance of eight or ten miles above the dam. A bond issue of $400,000 was authorized by a popular vote. Before the bonds were sold, complainant caused a notice to be served upon the city to the effect that she was advised that the present and prospective use of the waters of the Flint river by the city of Flint was unlawful and an invasion of her rights, and that it was her purpose to seek redress for the injury to her occasioned thereby. Negotiations for an adjustment of the rights of the parties having failed, the city proceeded with the erection of a new plant at the point decided upon, and it is now, and has for some time been, operating the same with success, and is supplying to the inhabitants of the city water suitable for domestic and other purposes. The connected capacity of the new plant is 23,000,000 gallons per day; that of the old was approximately 8,000,000 gallons per day. The filtration basins now in use have a normal capacity of 8,000,000 gallons per day.

Complainant files her bill for the purpose of enjoining defendant city from diverting water from her millpond and for past damage, and, if injunctive relief is denied, then for future damages. The trial court made a decree, which, among other things, granted the defendant the right to continue to divert

the average volume of water which had been taken and pumped from the years 1890 to 1908, inclusive, or 353,000,000 gallons per year, and assessed complainant's past damages at the sum of $1,097, and enjoining the city from taking any water from complainant's pond in the future in excess of 353,000,000 gallons per annum. Defendant appeals generally. Complainant appeals from that part of the decree which allows defendant the continued use of 353,-000,000 gallons of water per year and from the assessment of complainant's damages at the sum of $1,097. Complainant conceded upon the trial that defendant had acquired a right by prescription to take from said pond 235,790,000 gallons of water per annum.

BROOKE, C. J. (*after stating the facts*). Defendant's first position is: That the defendant city has the absolute paramount right to divert from the Flint river (a public navigable stream) sufficient water for the use of the inhabitants of said city, for fire, domestic, sanitary, and other public purposes. That such right is superior to all riparian property rights acquired by complainant and her grantors. That all such rights now possessed by complainant in said stream are and always have been subordinate to the rights of the public.

By section 3247, 1 Comp. Laws, incorporated cities are given authority to purchase, construct, and maintain waterworks for the introduction of water into such city and supplying the inhabitants thereof with pure, wholesome water for their ordinary and extraordinary uses, the extinguishment of fires, and for such other purposes as the council may prescribe. At the outset it may be said that there is a conflict in authority as to the right of a municipality to divert water from streams for the purpose of furnishing its inhabitants such water for domestic use without com-

pensating injured riparian owners, and it is claimed
the weight of that authority is against such right.
The cases from foreign jurisdiction sustaining com-
plainant's view upon this point will be found collected
in 37 L. R. A. (N. S.) 312, and note. There are,
however, several jurisdictions in which a different
view obtains, to which reference will be made
later in this opinion. Complainant relies upon the
following decisions in this State: *Thunder Bay, etc.,
Booming Co.* v. *Speechly,* 31 Mich. 336 (18 Am. Rep.
184) ; *Hall* v. *City of Ionia,* 38 Mich. 493; *Stock* v.
*Township of Jefferson,* 114 Mich. 357 (72 N. W. 132,
38 L. R. A. 355) ; *People* v. *Hulbert,* 131 Mich. 156
(91 N. W. 211, 64 L. R. A. 265, 100 Am. St. Rep.
588) ; *Stock* v. *City of Hillsdale,* 155 Mich. 375 (119
N. W. 435). An analysis of these cases will demon-
strate that they are not controlling of the question
here presented. The one nearest in point is the case
of *Stock* v. *City of Hillsdale, supra.* The distinctions
to be noted between the facts in this case and the one
at bar are that Bawbeese lake, the body of water from
which the city of Hillsdale drew its supply, was in a
sense private in character, and, in any event, lacked
the qualities which are necessarily characteristic of
a public navigable river. Again, the city of Hillsdale
is not located upon the banks of said lake, whereas
the Flint river runs directly through the center of the
city of Flint. At this point, and while considering
the law as settled by this case, it is well to remark
that, if the complainant is entitled to recover at all,
the decree entered is wrong in two notable respects:
*First,* under the circumstances of the case, she is not
entitled to an injunction; and, *second,* she is not en-
titled to recover from the defendant for the value of
water taken by it in excess of the prescriptive quan-
tity, except at such times as such excessive use actu-
ally causes damage to her. We are of opinion that

complainant's right to recover must be wholly denied upon broader grounds. The following authorities sustain this view:

In the case of *City of Philadelphia* v. *Collins*, 68 Pa. 106, at page 123, it is said:

"It was conceded on the trial that, upon taking water for the citizens of the city for domestic purposes, no restriction could be placed by legislation or grant, and none was placed. If it could have been shown that it was this supply for domestic purposes only which occasioned the insufficiency for navigation, then the law of a paramount necessity would have existed, and have brought into play the doctrine of riparian rights, and justified the taking."

In the case of *City of Auburn* v. *Power Co.*, 90 Me. 576, at page 585 (38 Atl. 561, at page 565, 38 L. R. A. 188), we find the following language:

"We think the doctrine of the majority opinion is correct. It is sustained by reason as well as authority. Water for domestic use is a necessity. Man cannot exist without it. Water for the use of mills is a convenience only. And there is no conceivable reason why those who want it for domestic use should be compelled to buy it of those who want it for the use of mills."

And it was said in *Davis* v. *Winslow*, 51 Me. 264 (81 Am. Dec. 573):

"Water, air, and light are the gifts of Providence, designed for the common benefit of man, and every person is entitled to a *reasonable* use of each. * * * A reasonable use is the touch-stone to which cases of this description must be subjected."

In *Davis* v. *Getchell*, 50 Me. 602 (79 Am. Dec. 636), it is held that this right to a reasonable amount of water for domestic purposes necessarily implies a right to diminish the volume of the water.

In *Haupt's Appeal*, 125 Pa. 211, at page 224 (17 Atl. 436, at page 438, 3 L. R. A. 536), the Chief Jus-

tice, quoting from *City of Philadelphia* v. *Collins,*
*supra,* says:

"Every individual residing upon the banks of a
stream has a right to the use of the water to drink
and for the ordinary uses of domestic life; and where
large bodies of the people live upon the banks of a
stream, as they do in large cities, the collective body
of the citizens has the same right, but, of course, in
a greatly exaggerated degree."

And again quoting from *City of Philadelphia* v.
*Com'rs of Spring Garden,* 7 Pa. 348:

"The inhabitants of the district might have law-
fully dipped, from the margin of the pool, water
enough for their several necessities; but instead of
drawing it by hand they have combined their funds
to produce a cheaper and better transportation."

Continuing, he says:

"There can be no such thing as ownership in flow-
ing water; the riparian owner may use it as it flows;
he may dip it up and become the owner by confining
it in barrels or tanks, but, so long as it flows, it is
as free to all as the light and the air. It follows, from
what has been said, that dwellers in towns and vil-
lages watered by a stream may use the water as well
as the riparian owner, provided they have access to
the stream by means of a public highway."

In the early case of *Evans* v. *Merriweather,* 3 Scam.
(4 Ill.) 492, at page 495 (38 Am. Dec. 106), a case
cited in nearly all the later authorities, we find the
following language:

"It is proper to consider the wants of man in
regard to the element of water. These wants are
either natural or artificial. Natural are such as are
absolutely necessary to be supplied, in order to his
existence. Artificial, such only, as by supplying
them, his comfort and prosperity are increased. To
quench thirst, and for household purposes, water is
absolutely indispensable. In civilized life, water for
cattle is also necessary. These wants must be sup-
plied, or both man and beast will perish. The supply

of man's artificial wants is not essential to his existence; it is not indispensable; he could live if water was not employed in irrigating lands, or in propelling his machinery."

In *Barre Water Co.* v. *Carnes,* 65 Vt. 626, at page 629 (27 Atl. 609, at page 610, 21 L. R. A. 769, 36 Am. St. Rep. 891), it is said:

"Dwellers in towns and villages watered by a stream may use the water for domestic purposes to the same extent that a riparian owner can, provided they can reach the stream by a public highway or secure a right of way over the lands of others. It is immaterial how the dwellers on the stream take the water for the purposes for which they may lawfully use it. They can drive their cattle to the stream and allow them to quench their thirst, and can carry water in pails to their homes; or each individual can carry the water in a pipe to his dwelling for such use, provided he can secure a right of way for that purpose; or the dwellers on the stream may combine their funds to procure cheaper and better transportation by means of a pipe, and may use the water for their several necessities to the same extent that they could if it flowed past their dwellings in a natural channel."

The case of *City of Elgin* v. *Hydraulic Co.,* 85 Ill. App. 182, is in point. There it is said, at page 193 of 85 Ill. App., quoting from *City of Auburn* v. *Power Co.,* 90 Me. 576 (38 Atl. 561, 38 L. R. A. 188):

"Health is of more importance than wealth, and cleanliness is next to godliness; and we hold that the right of the people to an abundant supply of pure water, by which their health and cleanliness may be secured, is paramount to the right of millowners to have the water for propelling their machinery, and that, to the extent that the two rights conflict, the latter must yield."

Continuing, the court said:

"We are therefore of opinion that the right of the public residing along Fox river to take water out of the same for domestic, sanitary, and fire purposes is

paramount to the right of the owners of said water power to use the same for the purpose of propelling the machinery of their mills."

See, also, *Watuppa Reservoir Co.* v. *City of Fall River*, 147 Mass. 548 (18 N. E. 465, 1 L. R. A. 466).

In 1902 the supreme court of the State of Ohio passed upon the question in *City of Canton* v. *Shock*, 66 Ohio St. 19, at page 31 (63 N. E. 600, at page 603; 58 L. R. A. 637, 90 Am. St. Rep. 557), where the court said:

"From the earliest dawn of history to the present time, the primary use of water has been for domestic purposes, and its secondary use for the purposes of power. People on the upper stream have the right to quench their thirst, and the thirst of their flocks and herds, even though by so doing the wheels of every mill on the lower stream should stand still. *Pennsylvania R. Co.* v. *Miller*, 112 Pa. 34, 41 [3 Atl. 780]. And the same right in the use of water as to quenching thirst extends to all uses for domestic purposes; and the rights of a lower proprietor to the use of the waters of a stream for power purposes is subject to the superior right of all upper proprietors for domestic purposes, and must yield thereto. All water powers of a stream are established subject to the superior right of all upper proprietors to use water out of the stream for domestic purposes; and if the upper proprietors have grown so large, or become so numerous, as to consume most or all of the water, the lower proprietors have no cause of complaint, because it is only what they should have reasonably expected in the growth and development of the country, and subject to which contingency they established their water powers."

The supreme court of Minnesota has reached the same conclusion in *Minneapolis Mill Co.* v. *Water Com'rs*, 56 Minn. 485. At pages 489, 490 (58 N. W. 33, at page 34), the court there said:

"The plaintiffs are riparian owners on a navigable or public stream, and their rights as such owners are subordinate to public uses of the water in the stream.

And their rights under their charters are, equally with their rights as riparian owners, subordinate to these public uses. There can be no doubt but that the public, through their representatives, have the right to apply these waters to such public uses without providing for or making compensation to riparian owners. The navigation of the stream is not the only public use to which these public waters may be thus applied. The right to draw from them a supply of water for the ordinary use of cities in their vicinity is such a public use, and has always been so recognized. At the present time it is one of the most important public rights, and is daily growing in importance as population increases. The fact that the cities, through boards of commissioners or officers whose functions are to manage this branch of the municipal government, charge consumers for water used by them, as a means for paying the cost and expenses of maintaining and operating the plant, or that such consumers use the water for their domestic and such other purposes as water is ordinarily furnished by city waterworks, does not affect the real character of the use, or deprive it of its public nature. In thus taking water from navigable streams or lakes for such ordinary public uses, the power of the State is not limited or controlled by the rules which obtain between riparian owners as to the diversion from, and its return to, its natural channels. Once conceding that the taking is for a public use, and the above proposition naturally follows."

This case was affirmed on appeal to the Supreme Court of the United States. See *St. Anthony Falls Power Co.* v. *Water Com'rs,* 168 U. S. 349, at page 371 (18 Sup. Ct. 157, at page 166). Mr. Justice Peckham, writing the opinion of the court, says:

"We are of opinion that the true construction of these territorial charters does not give such contract rights as are claimed by the plaintiffs in error. They were grants of power to the respective companies, under which they were licensed to build their dams out into the river for the purpose of utilizing the power, and of using the water that flowed down the river. These grants were in legal effect subject at

all times to the paramount right of the State as trustee for the public to divert a portion of the waters for public uses, and they were also subject to the rights in regard to navigation and commerce existing in the general government under the Constitution of the United States.   *   *   *   There was no contract, by virtue of these charters, that the companies should always and for all time be entitled to all the natural flow of the water in the river, without regard to the right of the State, as above mentioned.   The claim made by the companies seems to us most extravagant. The State or any particular subdivision thereof, acting under its authority, would, if these claims were valid, be forever thereafter prevented from using any portion of the waters of the river for any public purpose, unless compensation for such use were first made these plaintiffs.   This construction of the meaning of the charters assumes the power of a territorial or State legislature to bind future legislatures in dealing with these public rights, and it prevents the latter from providing for the use of any portion of the waters for public purposes of the most important character without first making compensation to the plaintiffs for that use.   If we should assume the validity of an act of the legislature of such a character (which, under the decision of this court in *Illinois Central Railroad* v. *Illinois*, 146 U. S. 387 [13 Sup. Ct. 110], is at least doubtful), it is clear that we ought not to adopt a construction leading to that result, unless the legislative act be plain and beyond all doubt.   We are of opinion that these particular charters of the plaintiffs are not to be thus construed. The sections of the acts which are material upon this point simply authorize the companies to maintain their dams and sluices, and permit them to construct and maintain other dams, etc., for the purpose of manufacturing, or for improving any water power owned or possessed by the companies, in such manner or to such extent as shall be authorized by the directors.   But there is no language in the acts providing that the companies shall thereafter and always have the right to the use of all the natural flow of the water down the river.   Nor is such right a necessary and legal consequence of the language used.   They may

185 Mich.—30.

have acquired by these acts the right to build dams, etc., and the right to use such water as in fact and from time to time should flow down to their dam; but there is nothing in the language of the charters showing or implying that it was the intention of the State to grant to these parties the rights now claimed by them. ' It is difficult to believe that a legislature would ever grant to individuals or companies rights of that nature, even if it be assumed it had the power. It was proper and in accordance with a wise public policy to grant a privilege to these companies to build dams, etc., as stated in the charters, and to permit them, by virtue of the dams and sluices, to use the water that in fact and from time to time might come down the river; but it cannot be supposed that the legislature meant by any grant of this kind to warrant that for all future time no part of the water that might otherwise naturally flow down the river should ever be used under the authority of the State for any public purpose, without compensating the plaintiffs for that diversion." ·

The great and constantly increasing use of the waters of the rivers of this State for the production of power makes the matter here in issue one of prime importance.

The basic question involved is an open one in this State, and we are at liberty to follow such rule as is supported by sound reason and what we conclude to be the weight of authority. In the light of the foregoing authorities, and in consonance with the humanitarian principles there announced, we have no difficulty in reaching the following conclusions:

(1) The Flint river is in fact and in law a public navigable stream flowing through the heart of the city of Flint.

(2) The city of Flint is a riparian owner situated upon the banks of said river, and as such, and as an incident to such ownership, it is entitled to take from said river so much water as is reasonably necessary for the personal use of its inhabitants and its ordi-

nary municipal needs without compensation to complainant.

In *Attorney General* v. *City of Grand Rapids*, 175 Mich. 503 (141 N. W. 890, 50 L. R. A. [N. S.] 473), we lately held the city of Grand Rapids to be an upper riparian owner and liable as such owner for pollution of the Grand river affecting a lower riparian municipality.

(3) The question of the right of the city of Flint to compel complainant to maintain her dam for the purpose of providing a reservoir for the use of defendant city without charge to the city is not involved in this case.

(4) The rule announced as to small private streams (*Hall* v. *City of Ionia, supra*), or as to small inland lakes (*Stock* v. *City of Hillsdale, supra*), has no application to the case at bar, which involves a public navigable river passing through the heart of defendant city.

The decree of the court below is reversed, and the bill dismissed.

McALVAY, KUHN, and STEERE, JJ., concurred with BROOKE, C. J.

MOORE, J. I cannot agree with the result reached in this case by the Chief Justice. Many of the cases he cites are clearly distinguishable from the instant case.

In *City of Philadelphia* v. *Collins*, 68 Pa. 106, the question of the liability of the city for the diversion of water for domestic purposes was not involved. The city was sued for damages for impeding navigation by drawing down the water by using it for power purposes, and a judgment against it for damages was sustained.

In *Auburn* v. *Water Power Co.*, 90 Me. 576 (38 Atl. 561, 38 L. R. A. 188), it was said:

"It is a settled rule of law in this State and Massachusetts that all great ponds (that is, ponds containing more than ten acres) are owned by the State. This is a rule of law peculiar to this State and Massachusetts. It is said to have been derived from the Colonial Ordinance of 1641-47. The rule, as stated by Chief Justice Morton, in a recent Massachusetts case, is as follows: 'Under the ordinance, the State owns the great ponds as public property, held in trust for public uses. It has not only the *jus privatum,* the ownership of the soil, but also the *jus publicum,* and the right to control and regulate the public uses, to which the ponds shall be applied. The littoral proprietors of land upon the ponds have no peculiar rights in the soil, or in the waters, unless it be by grant from the legislature.' *Watuppa Reservoir Co.* v. *City of Fall River,* 147 Mass. 548 [18 N. E. 465, 1 L. R. A. 466]."

The court is careful to say:

"And it is only of our great public ponds and lakes that we are now speaking. We are not declaring or attempting to define the rights appertaining to wells, springs, rivulets, or small ponds. It is only of great ponds and lakes, the titles to which are held by the State for the use of the public, that we are now speaking. And of these great public ponds and lakes we affirm that, by the rules of the common law of this State, the people are entitled to a reasonable portion of their waters for domestic purposes without being obliged to buy it of the owners of mill privileges."

This language will indicate the reason of the Maine and Massachusetts cases.

The language quoted from *Elgin* v. *Hydraulic Co.,* 85 Ill. App. 182, was taken from *Auburn* v. *Water Power Co., supra,* and was *obiter dictum,* for the opinion had already stated the plaintiff had no cause of action because not a riparian proprietor, and for the further reason that the city which was a riparian proprietor had not diverted more of the water than its reasonable share as a riparian owner.

Two of the cases cited by the Chief Justice are in

harmony with his opinion. *Canton* v. *Shock*, 66 Ohio
St. 19 (63 N. E. 600, 58 L. R. A. 637, 90 Am. St. Rep.
557), and *Minneapolis Milling Co.* v. *Water Works*,
56 Minn. 485 (58 N. W. 33). The last-named case
was affirmed on appeal in 168 U. S. 349, 18 Sup. Ct.
157. The learned justice who wrote the affirming
opinion stated therein that the property rights of
the riparian owners are to be measured by the rules
and decisions of the State courts of Minnesota. We
think it must be said as to these two cases that they
are not in harmony with the great weight of author-
ity.

In 37 L. R. A. (N. S.) at page 312, it is said:

"There is some conflict among the authorities as
to whether or not nontidal waters may be diverted for
the purpose of furnishing a municipality and its in-
habitants with water for domestic use without com-
pensating injured riparian owners, but the great
weight of authority denies such a right even where
the municipality is located on the banks of the stream.
The following cases adhere to the general rule that
the waters of a stream cannot be diverted for mu-
nicipal purposes to the injury of a riparian proprietor
without compensating him for the resulting damage:
*Pine* v. *New York* [C. C.] 103 Fed. 337, affirmed in
50 C. C. A. 145, 112 Fed. 98, and reversed on other
grounds in 185 U. S. 93, 22 Sup. Ct. 592; *United
States* v. *Great Falls Manfg. Co.*, 112 U. S. 645, 5
Sup. Ct. 306; *Ulbricht* v. *Eufaula Water Co.*, 86 Ala.
587 (6 South. 78, 4 L. R. A. 572, 11 Am. St. Rep.
72); *Beckerle* v. *Danbury*, 80 Conn. 124 (67 Atl.
371); *Oelschleger* v. *City of Boston*, 200 Mass. 425
(86 N. E. 883); *Acquackanonk Water Co.* v. *Wat-
son*, 29 N. J. Eq. 366; *Higgins* v. *Flemington Water
Co.*, 36 N. J. Eq. 538; *Gilzinger* v. *Saugerties Water
Co.*, 66 Hun (N. Y.), 173 (21 N. Y. Supp. 121),
affirmed without opinion in 142 N. Y. 633 (37 N. E.
566), (nonnavigable stream); *Standen* v. *New
Rochelle Water Co.*, 91 Hun (N. Y.), 272 (36 N. Y.
Supp. 92) (nonnavigable stream); *Sumner* v. *Glov-
ersville*, 35 Misc. Rep. 523 (71 N. Y. Supp. 1088)
(holding, however, that the amount must be ma-

terial) ; *Fischer* v. *Clifton Springs* [Sup.] 121 N. Y.
Supp. 163, affirmed without opinion in 140 App. Div.
918 (125 N. Y. Supp. 1119) ; *Gallagher* v. *Kingston
Water Co.*, 25 App. Div. 82 (49 N. Y. Supp. 250) ;
*Gray* v. *Ft. Plain*, 105 App. Div. 215 (94 N. Y. Supp.
698) ; *Gardner* v. *Newburgh*, 2 Johns. Ch. [N. Y.]
162 (7 Am. Dec. 526) ; *Ehrgood* v. *Moscow Water
Co.*, 4 Lack. Legal News (Pa.) 151; *Heckscher & Co.*
v. *Shenandoah Citizens' Water & Gas Co.*, 2 Legal
Chron. 273, affirmed in *Shenandoah Co.'s Appeal*, 2
Wkly. Notes Cas. (Pa.) 46 (nonnavigable stream) ;
*Reading* v. *Althouse*, 93 Pa. 400; *Lycoming Gas &
Water Co.* v. *Moyer*, 99 Pa. 615; *Haupt's Appeal*, 125
Pa. 211, 17 Atl. 436 (3 L. R. A. 536) ; *Leonard* v.
*City of Rutland*, 66 Vt. 105 (28 Atl. 885) ; *Rigney*
v. *Tacoma Light & Water Co.*, 9 Wash. 576 (38 Pac.
147, 26 L. R. A. 425) ; *Swindon Waterworks Co.* v.
*Wiltz & B. Canal Nav. Co.*, L. R. 7 H. L. 697; 45 L.
J. Ch. (N. S.) 638, 33 L. T. (N. S.) 513; 24 Week.
Rep. 284, 22 Eng. Rul. Cas. 226. And in *Smith* v.
*Rochester*, 92 N. Y. 463 (44 Am. Rep. 393), referred
to in *Fulton Light, Heat & P. Co.* v. *State*, the court,
adhering to the rule that the title to the beds of fresh
water streams is in the owners of the adjacent lands,
held that, although actually navigable, such public
easement gives the State no right to divert the water
of such a stream or its source, or to authorize their
diversion for any use other than navigation, except
by virtue of the right of eminent domain and upon
making just compensation; and that therefore a city
cannot divert waters which would naturally flow
through a nontidal stream for the purpose of furnish-
ing a municipal water supply, without compensating
the riparian owners injured by the diversion."

The question of riparian rights has been before
this court in several cases. See *Thunder Bay, etc.,
Booming Co.* v. *Speechly*, 31 Mich. 336 (18 Am. Rep.
184), and *Hall* v. *City of Ionia*, 38 Mich. 493.

In *Stock* v. *Township of Jefferson*, 114 Mich. 357
(72 N. W. 132, 38 L. R. A. 355), and *People* v. *Hul-
bert*, 131 Mich. 156 (91 N. W. 211, 64 L. R. A. 265,
100 Am. St. Rep. 588), there are many authorities

collected from which quotations are freely made. A reference to these authorities may be helpful.

The case of *Stock* v. *City of Hillsdale*, 155 Mich. 375 (119 N. W. 435), is on all fours with the instant case. The only differences are in the names of the streams from which the water was diverted, the quantity thereof, and the names of the parties to the litigation. The streams ran through the defendant cities. The water diverted was for the use of the citizens of the respective municipalities, chiefly for domestic use. Justice MONTGOMERY, speaking for the court, said:

"The circuit judge properly held that the city had not the right to divert the water as an upper riparian owner and to pump the water out of this lake for the use of citizens generally and to supply manufacturing establishments within its limits, and he also found that the use of the water in the manner in which it was used by the city had affected seriously the flow of water to the complainant's mill properties, and implied that he had suffered some damage."

In view of the facts disclosed by the record, it was held injunctive relief should not be granted:

"It is undeniable, however, that the complainant's rights were infringed by diverting this water, and that the value of his property (the mill at Hillsdale) was to some extent affected by this fact, and we think that the rights of complainant may well be adjudged in this case. The complainant's damages should be awarded in gross, even though he has not shown himself entitled to a writ of injunction. See *Blake* v. *Cornwell*, 65 Mich. 467 (32 N. W. 803), and *Allen* v. *Electric Co.*, 144 Mich. 370 (108 N. W. 79, 115 Am. St. Rep. 453).

"The decree will be modified to this extent, and the case will be remanded, with the privilege of putting in further testimony upon the distinct question of the damages to complainant's property by the conversion of the water for the use of the city to the extent of the capacity of the improved plant, as well as for the damage sustained by the increased use of water above

the amount fixed by the prescription for the period of six years prior to the filing of this bill, and for this amount decree should be entered by the circuit court for the complainant, with costs."

It is possible the time may come when the paramount necessity of a city to use the water of a navigable stream for domestic purposes will become so pressing that legislative action will be justified in changing the rule now existing, but this record does not disclose such necessity.

In the case before us the plant was originally erected with the tacit, if not express, consent of the millowner. It was conceded by the complainant on the trial that defendant had acquired a prescriptive right to take from the pond 235,790,000 gallons of water annually, while the learned trial judge found the quantity to be 353,000,000 gallons. If we apply the reasoning in *Stock* v. *Hillsdale* to the instant case, we should deny, because of the facts disclosed by the record, injunctive relief, and fix the damages in this proceeding once for all, and remand the case with the privilege of putting in further testimony upon the distinct question of the damage to complainant's property by the conversion of the water for the use of the city, as well as for the damages by the increased use of water above the quantity fixed by the prescription for the period of six years prior to the filing of this bill, and for these amounts decree should be entered in the circuit court in favor of complainant.

In determining these damages, no allowance should be made the complainant for the use of water at times when such use did not reduce the volume of the water below the needs of the complainant's mill. Complainant will recover costs.

STONE, OSTRANDER, and BIRD, JJ., concurred with MOORE, J.